IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Horacio Vazquez, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 04 C 861 |
| | ) | 04 C 1798 |
| v. | ) | |
| | ) | Hon. Mark Filip |
| Central States Joint Board, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Horacio Vazquez, Hermes Ruiz, Jeffery Keating, and Kevin Kane filed this action against Defendants, Central States Joint Board ("CSJB"), International Union of Allied Novelty and Production Workers ("International Union"), Mark Spano, Steve Torello, Benny Castro, Mike Flynn, Frank Olvera, John McDonough, Rocco Miranti, Kathleen Rodriguez, Antonio Patino, Johnny Miranti, William Widmer, John Ward, and Greg Auteri. (D.E. 97.) Plaintiffs bring Counts I, IV, VI and VIII under Sections 101(a)(1) and 101(a)(2) of the Labor Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. §§ 411(a)(1), 411(a)(2). Counts II, V, VII, and IX are brought under Sections 101(a)(5)(C) and 609 of the LMRDA, 29 U.S.C. §§ 411(a)(5)(C) & 529, and Section 301 of the Labor Management Reporting Act (LMRA), 29 U.S.C. § 185. Counts III and X are Illinois state law contract claims brought by Vazquez and Kane, respectively, under the CSJB Employment Manual and the International Union Constitution (IUC). Count XI is brought pursuant to the Racketeer Influenced and Corrupt Practices Act (RICO), 18 U.S.C. §§ 1962(c) & (d), 1964(c). Defendants have filed motions to dismiss.

For the reasons stated below, the motions to dismiss are granted in part and denied in part. Specifically, to the extent and as explained below, Plaintiffs' claims under LMRDA Section 101(a)(1) are dismissed with prejudice, Plaintiffs' claims under LMRDA Section 101(a)(5) are dismissed in part without prejudice, Plaintiffs' civil RICO claims are dismissed without prejudice, Plaintiff Kane's state contract claim is dismissed without prejudice, and the Plaintiffs' various other state law claims are dismissed in part as explained. The motions to dismiss are otherwise denied.

## FACTUAL ALLEGATIONS

The factual allegations related below are taken from the Plaintiffs' Second Amended Complaint. (D.E. 97.) The Court relates the allegations as set forth in the operative complaint, as precedent directs. The Court takes no position as to whether any of the allegations are in fact true. That factual evaluation will await further stages in the proceedings as to appropriate claims.

I.    The Parties and Organizations Involved in this Action

International Union is a labor organization that is comprised of subordinate bodies of Joint Boards and Local Unions, including the CSJB and Locals 12, 16, 18, 24, and 30 (the "Five Locals"). (D.E. 97 ¶¶ 25-30.) International Union's General Executive Board ("International Board") controls the International Union. (*Id.* ¶ 32.) Spano, Torello, Patino, Castro, Flynn, Johnny Miranti, and Rocco Miranti are all members of the International Board. (*Id.* ¶ 33.) As a subordinate body, the CSJB is subject to the provisions of the Constitution of the International Union ("IUC"). (*Id.* ¶ 36.) Likewise, the Five Locals are controlled by the CSJB pursuant to the IUC and the CSJB Constitution. (*Id.* ¶ 41.) Under the provisions of the CSJB Constitution, the CSJB Executive Board controls the CSJB. (*Id.* ¶ 43.) The members of the CSJB Executive

Board are President Spano, Secretary-Treasurer Torello, and Vice Presidents Castro, Flynn,

Olvera, McDonough, and Rodriguez. (*Id.* ¶ 44.)

All Local Unions and Joint Boards are chartered by and subordinate to the IUC, which is

intended, among other things, to provide for democratic institutions and procedures, and to

extend civil rights and liberties to its members. (*Id.* ¶¶ 64-65.) The IUC provides that the

governing body of the International Union is the General Executive Board. (*Id.* ¶ 66.) The IUC

provides that the International Union's President has the power to investigate subordinate bodies

and may place them in trusteeship to correct corruption and financial malpractice and restore

democratic procedures. (*Id.* ¶¶ 69-70.) For any officer of a subordinate body against whom

charges are brought, the IUC requires due process, including the right to have the Local Union's

Executive Board consider all evidence pertaining to the charge(s), and the right to appeal to the

International Board. (*Id.* ¶¶ 72-73.) The CSJB Constitution provides that the CSJB President

has complete supervision over the CSJB, subject to the approval of the International Board.

(*Id.* ¶ 76.) Local 10's Constitution provides that it shall comply with all provisions of the IUC.

(*Id.* ¶ 79.) It states that no member shall be disciplined unless that member has been given a

reasonable time to prepare his defense and afforded a full and fair hearing. (*Id.* ¶ 82.) It also

provides that the accused shall be tried by Local 10's Executive Board, and that no lawyer shall

be permitted to appear on behalf of any person or entity. (*Id.* ¶¶ 84-85.) The CSJB Employment

Manual provides that an employee shall have the right to grieve any decision affecting

employment to a three-member board, consisting of the CSJB President, the President of the

employee's Local Union, and one other employee selected by the grieving employee. (*Id.* ¶ 88.)

The decision of the three member board is binding and no other appeal is allowed. (*Id.*)

All four Plaintiffs were terminated from the following union positions in 2004 (the "Terminations"). (*Id.* ¶¶ 11, 13-15, 17-19, 21-22.) Ruiz was a member and elected President of the International Union, the elected First Vice President of the CSJB Executive Board, the elected President of Local 24, the Servicing Director of the CSJB, a union appointed trustee of the CSJB Health and Welfare Fund and the Midwest Pension Plan (the "Funds"; *see id.* ¶ 3), and a union appointed Trustee on the International Union's Pension Fund. (*Id.* ¶ 14-15.) Keating was a member and the Third Vice President of the International Union, the elected Secretary-Treasurer of the CSJB's Executive Board, the elected President of Local 16, a union appointed Trustee of the Funds, the elected Chairman of the CSJB Health and Welfare Fund (the "Health Fund"),[1] the appointed Plan Manager of the Funds, and the appointed trustee of the CSJB Staff Pension Plan.[2] (*Id.* ¶¶ 17-19.) Kane was a member of the International Union, the elected Secretary-Treasurer of Local 24, and a CSJB business agent. (*Id.* ¶¶ 21-23.)

II.     Spano's Alleged Scheme

Plaintiffs allege that when Spano assumed the CSJB presidency in 2002, he "embarked on a systematic scheme to assert autocratic control over the Unions, eliminate any opposition to his authority, . . . eliminate democracy within the Unions, and turn the Unions over to elements of organized crime." (*Id.* ¶ 89.) Plaintiffs allege that Spano considered Vazquez, Ruiz, Keating,

---

[1] The Health Fund is a benefit fund as defined by the Employee Retirement Income Security Act (ERISA). (D.E. 97 ¶ 53.) It is governed by employer and union appointed Trustees, who appoint a manager for the funds. (*Id.* ¶¶ 54, 56.) The union appointed Trustees are Spano, Torello, McDonough, Flynn, and Castro. (*Id.* ¶ 58.)

[2] The Midwest Pension Plan ("Pension Plan") is a benefit fund as defined by ERISA that is also controlled by employer and union appointed trustees, who appoint a manager for the plan. (*Id.* ¶¶ 59-61.) The union appointed Trustees are Spano, Torello, Olvera, Flynn, and Castro. (*Id.* ¶ 63.)

and Kane to be threats to him and the scheme because of their open opposition to Spano. (*Id.* ¶ 109.) Spano recruited CSJB Executive Board members and International Union Board members to participate in the scheme and to ensure that Vazquez, Ruiz, Keating, and Kane would not be able to oppose him or his scheme. (*Id.* ¶ 110.) Spano also recruited attorneys Widmer and Ward and accountant Auteri to assist him in asserting autocratic control over the Unions, to stifle dissent within the Unions, and to destroy democracy within the Unions. (*Id.* ¶ 111.)

Spano allegedly began implementation of the scheme when he hired James Bertino as a business agent on March 18, 2002, at a salary of $96,000 per year. (*Id.* ¶ 90.) The customary practice was to hire CSJB business agents at a salary of approximately $30,000 per year. (*Id.* ¶ 93.) Bertino had allegedly been removed from another labor organization because of his association with elements of organized crime. (*Id.* ¶ 91.) Spano and others have continued to hire associates of elements of organized crime since the 2004 terminations of Plaintiffs, by hiring Mike Christopher and Peter Aigulla, both of whom allegedly were removed from positions in other labor organizations because of their association with organized crime elements. (*Id.* ¶ 92.)

Keating told Spano that he knew Bertino was an associate of elements of organized crime and that Spano should not employ Bertino. (*Id.* ¶ 94.) Spano told Keating that he had hired Bertino because he had been told to hire him by "certain people," and Spano allegedly threatened Keating by telling him that he had better wise up and do what he was told or "he would be history." (*Id.* ¶ 95.) Keating understood that "certain people" were elements of organized crime, since Spano's father, Paul Spano, and uncle, Mike Spano, allegedly were known members of organized crime. (*Id.* ¶ 96.) Fearing that Spano would put other associates of organized crime on the CSJB payroll, Keating called a special meeting of the CSJB Executive Board on March

28, 2002. (*Id.* ¶ 97.) At the meeting, the Board voted to restrict Spano's ability to pay new CSJB employees excessive salaries. (*Id.* ¶ 98.) Spano allegedly was infuriated by this action, and after the meeting he allegedly threatened Keating by stating: "Don't you understand who you're f***ing with? I've been told what's going to happen here and that's that. Things have changed and you'll either go along with the program or you won't be here to stop it!" (*Id.* ¶ 99.) Keating, operating under the understanding that Spano was being controlled or influenced by organized crime, replied that neither Spano nor anyone else was going to steal the members' money and that he would oppose any of Spano's actions that were not for the good of the membership. (*Id.* ¶ 100.) Spano then allegedly threatened Keating by stating, "I'm not going to tell you this again: I'm the boss now and I make the decisions whether you like it or not. And if you don't do what I say I'll fire you!" (*Id.* ¶ 101.)

In September of 2002, Vazquez and Kane openly questioned Spano regarding his decision to hire Bertino because of his association with organized crime elements. (*Id.* ¶ 102.) Vazquez and Kane told Ruiz that Bertino was a "ghost payroller" since he received a salary but did little or no work. (*Id.* ¶ 103.) Ruiz began an investigation into Bertino's work performance. (*Id.* ¶ 104.) Spano blocked Ruiz's investigation, telling Ruiz that he hired Bertino because he had been told to hire him by "outside sources." (*Id.* ¶ 105.) Ruiz understood these outside sources to be elements of organized crime. (*Id.* ¶ 106.) When Ruiz told Spano that elements of organized crime were not going control the CSJB, Spano threatened Ruiz by telling him to wise up and do what he was told or "he would be history." (*Id.* ¶¶ 107-108.)

After the dispute over Bertino's employment, Spano began attempts to take control of the Funds. (*Id.* ¶ 112.) Keating, the Funds' Plan Manager, controlled the operation of the Funds on

a day-to-day basis. (*Id.* ¶ 113.) Spano, by contrast, had no authority to hire Fund employees or be involved in the day-to-day operations of the Funds. (*Id.* ¶ 114.) In May 2002, Spano attempted to force Keating to hire the granddaughter of an allegedly known member of organized crime as an employee for the Funds. (*Id.* ¶ 115.) When Keating allegedly discovered that the person Spano was attempting to force him to hire was related to a member of organized crime, he told Spano that there was no employment position open. (*Id.* ¶ 116.) Spano told Keating that he did not have to hire this particular person because she had died, but in the future, when Spano told him to hire someone as a Fund employee, Keating had better do what he was told. (*Id.* ¶ 117.)

Plaintiffs allege that it was the practice of the Funds to seek competitive bids for all service provider work that needed to be done. (*Id.* ¶ 118.) In April 2002, Spano attempted to force Keating, through threats of physical violence, to use certain vendors by ordering Keating to ignore the established bidding procedures of the Funds. (*Id.* ¶ 119.) When Keating blocked Spano's attempts to circumvent Fund policies, to breach his fiduciary responsibilities, and to violate ERISA provisions, Spano threatened Keating by telling him "[y]our time is running out. Either get on the train or get run over by it!" (*Id.* ¶ 121; *see also id.* ¶ 120.)

Plaintiffs allege that the CSJB Executive Board approved a proposal from Spano's wife, Rona Spano, a paid representative of American Income Life, to mail material from American Income Life Insurance to all CSJB members. (*Id.* ¶ 122.) According to the Complaint, Ward told the CSJB Executive Board that the transaction was not a prohibited transaction under the Landrum-Griffin Act, when in fact it was. (*Id.* ¶¶ 123-24.)

In February 2003, at a meeting of the Health Fund Trustees, Spano proposed that the

Trustees hire dental service provider Comp Dent and have the Health Fund change its PPO provider to "a guy he knows in Oak Brook." (*Id.* ¶ 125.) Keating openly opposed both of Spano's proposals and the Trustees refused to take any action on the proposals. (*Id.* ¶ 126.) Spano later threatened Keating because of this opposition by telling him: "Our patience is running out! You had better do what you're told or else!" (*Id.* ¶ 127.) Spano further stated: "You'll not only be fired, but you will find yourself in a car trunk. You know that the guys who are calling the shots now can take care of business." (*Id.*) Keating understood that Spano was allegedly referring to elements of organized crime, including allegedly Spano's father and uncle, when he made the threats. (*Id.* ¶ 128.) Keating replied that he was not going to allow Spano to manipulate the Health Fund for his or anyone else's gain. (*Id.* ¶ 129.) Ward allegedly took the minutes at this February 2003 meeting, and in an attempt to protect Spano, eliminated all references to Comp Dent, and eliminated "the guy in Oak Brook" reference. (*Id.* ¶¶ 130-31.) Because of Ward's actions, Keating prevailed upon the Health Fund Trustees to replace Ward, Widmer, and their law firm with another law firm and to hire a court reporter to take all future minutes. (*Id.* ¶ 132.) In February 2003, Keating opposed and stopped Spano's attempt to hire a person as a Health Fund and Pension Plan employee by telling Spano that he did not have the authority to do such hiring. (*Id.* ¶ 133.) Spano reiterated his alleged threats, while Keating responded that he was not going to let Spano destroy the union or the funds. (*Id.* ¶¶ 134-35.)

Near the end of April 2003, Ruiz and Keating met with Widmer to discuss Spano's unlawful activities and how Ward was assisting Spano to commit these alleged acts. (*Id.* ¶ 138.) Widmer allegedly agreed that Spano's activities were improper, and promised to meet with Spano and Ward and straighten them out. (*Id.* ¶ 139.) After this meeting, Spano allegedly

increased his threats to Keating. (*Id.* ¶ 140.) In May 2003, Keating convinced the Pension Plan

Trustees to replace Widmer, Ward, and their law firm with another firm. (*Id.* ¶ 141.) When

Widmer was informed of the loss of the pension plan as a client, he swore at Keating, allegedly

stating "[y]ou don't know what you have done." (*Id.* ¶ 142.)

In August 2003, Ruiz questioned the expenses revealed by an audit Defendant Auteri had

conducted of Local 148, which was under trusteeship by the International Union. (*Id.* ¶ 143.)

Ruiz believed that the salary and expenses of an employee of Local 148 were excessive, and cut

the pay of that employee. (*Id.* ¶ 144.) A few days later, Spano allegedly informed Ruiz that his

actions had caused elements of organized crime to become upset with Ruiz. (*Id.* ¶ 145.) Spano

allegedly told him that if he traveled to New York to visit Local 148 he would be killed, which

Ruiz believed to be a message relayed from organized crime. (*Id.* ¶¶ 145-46.) Ruiz then told

Spano that since Spano was a friend of the elements of organized crime threatening Ruiz's life,

that Spano was now responsible for all expenses incurred by Local 148. (*Id.* ¶ 147.)

On August 15, 2003, Spano proposed that the CSJB Executive Board approve another

mailing of American Income Life to all union members. (*Id.* ¶ 148.) Keating told the Executive

Board that he believed such a mailing would be a violation of the Health Insurance Portability

and Accountability Act ("HIPAA"). (*Id.* ¶ 149.) As a result, based on the information supplied

by Keating, the Board approved a mailing only to those members who were not participants in

the Funds. (*Id.* ¶ 150.)

In October 2003, however, there was a mailing of American Income Life Insurance

literature to all union members, including participants in the Funds. (*Id.* ¶ 151.) This occurred

because Spano allegedly provided the mailing names and addresses of Fund participants to his

wife, even though Spano knew that such a mailing would violate HIPAA. (*Id.* ¶ 152.) Later that month, Keating mailed a notice to all Fund participants, informing them that the mailing was a violation of HIPAA. (*Id.* ¶ 153.) Spano reacted to this notice by threatening Keating with physical violence. (*Id.* ¶ 154.)

On November 12, 2003, Spano received a letter from the Funds' attorney James Vanek, which stated that the mailing was a violation of HIPAA and a violation of ERISA, given the involvement of Spano's wife as a soliciting party. (*Id.* ¶ 155.) However, on November 17, 2003, Ward informed the Funds' Trustees in writing that the mailing was not a HIPAA violation, that no ERISA violation occurred, and he incorrectly pointed out that Keating was the one who proposed the mailing. (*Id.* ¶ 156.) Keating subsequently discovered that the minutes of the November 2002 CSJB Executive Board meeting had been altered to incorrectly reflect that he made the motion to approve the mailing. (*Id.* ¶ 157.) In a January 21, 2004 meeting, Vanek noticed the minutes he had of the meeting did not match the minutes provided to Keating by Spano, the version that was referenced in Ward's November 17th letter. (*Id.* ¶ 158.)

III.    Vazquez's Discharge

On August 4, 2003, after Spano had allegedly recruited other members of the CSJB and International Union Executive Boards to conspire in the scheme, he called Vazquez into his office. (*Id.* ¶¶ 160-163.) Ruiz was present when Vasquez came to Spano's office. (*Id.* ¶ 160.) Spano told Vazquez that he had enough grievances from the members to terminate him, stating "[n]ow I've got you by the balls! You'll either start doing things my way or you're fired!" (*Id.* ¶ 163.) When Vazquez told Spano that he would not allow him to destroy the union by eliminating democracy and bringing in elements of organized crime, Spano stated "[d]on't you understand

that I'm only doing what certain people are telling me to do!" (*Id.* ¶¶ 164-165.) Spano then swore at Vazquez and fired him. (*Id.* ¶ 165.) Vazquez interpreted "certain people" to be elements of organized crime, and Vazquez alleges that he was not really fired for poor work performance but for opposition to Spano and the scheme. (*Id.* ¶ 166-68.) After Vazquez left, Spano allegedly turned to Ruiz and threatened, "[t]hat's what will happen to any motherf***er that gets in my way! Including you and Keating!" (*Id.* ¶ 170.) When Ruiz told Spano that he did not have proper grounds to fire Vazquez, Spano allegedly said "[y]ou had better start minding your own f***ing business!" (*Id.* ¶ 171.) Plaintiffs allege that the CSJB employment manual entitled Vazquez to a fair and impartial arbitration hearing to determine whether his discharge was justified, but that Spano, Ward, and others took a series of actions that allegedly violated the CSJB Employment Manual and the International Constitution. (*Id.* ¶¶ 173, 181, 183, 186, 188, 191, 194, 197-98.)

More specifically, on August 4, 2003, Vazquez filed a grievance with Spano protesting his discharge, which Spano denied on August 12. (*Id.* ¶¶ 174-75.) Vazquez appealed to a three member arbitration panel pursuant to Article IX of the CSJB employment manual. (*Id.* ¶ 176.) That provision provided that Vazquez, as president of Local 10, could sit on that panel, but Spano informed him that he could not be part of the arbitration panel. (*Id.* ¶ 177.) Spano informed Vazquez that Spano would still sit as a member of the arbitration panel and requested that Vazquez name the third member of the panel. (*Id.* ¶¶ 178-79.) Vazquez objected, but Spano told him his objection had no merit. (*Id.* ¶ 180.)

Vazquez appealed to Ruiz to investigate Spano's denial, but the Executive Board blocked this investigation, on Spano's motion, at an October 15, 2003 meeting. (*Id.* ¶¶ 182-83.) Spano

then appointed Torello and McDonough to sit on the arbitration panel, whose members Plaintiffs allege were determined to uphold Vazquez's discharge regardless of the evidence. (*Id.* ¶¶ 184, 188.) Vazquez requested a stay in the arbitration, pending a decision of the International Union about the fairness of the hearing, but was told that the arbitration hearing was going to proceed. (*Id.* ¶¶ 189-90.) Vazquez then appointed Keating as a member of the arbitration panel, but the arbitration proceeded without Keating. (*Id.* ¶¶ 190-91.) Spano retained Ward to represent the CSJB at the arbitration hearing, but refused to allow Vazquez to have an attorney present. (*Id.* ¶ 192.) On November 4, 2003, the arbitration panel upheld Vazquez's discharge based on pretextual reasons. (*Id.* ¶¶ 193-94.)

On November 7, 2003, Spano filed charges against Vazquez to remove him as the elected President of Local 10. (*Id.* ¶ 195.) Ward allegedly assisted in Spano's scheme to deny Vazquez a fair hearing on the charges. (*Id.* ¶¶ 197-98.) Vazquez requested a continuance of the hearing pending the appeal of his termination as President of Local 10, but that was denied. (*Id.* ¶¶ 198-99.) The Executive Board of Local 10 held a hearing on the charges on November 19, 2003. (*Id.* ¶ 200.) John McDonough, a Spano ally who had already participated as a member of the arbitration panel that denied Vazquez's grievance, also sat as a member of Local 10's Executive Board. (*Id.* ¶ 201.) Once again, Ward participated and presented the same evidence against Vazquez from the earlier arbitration panel, while Vazquez himself was denied counsel. (*Id.* ¶¶ 204-05.) On November 25, 2003, Local 10's Executive Board removed Vazquez as its President, which allowed Spano and his allies to gain control of Local 10 and its finances. (*Id.* ¶¶ 206-09.)

IV.     Kane's Termination

In April 2003, Kane allegedly told Spano that he was not going to stand by and watch

12

Spano destroy the union, hurt the membership, and bring in alleged elements of organized crime. (*Id.* ¶ 210.) Spano allegedly told Kane "[y]ou don't know who you're f***ing with! If you oppose me, the door is going to hit you in the ass on your way to the street!" (*Id.* ¶ 211.) Kane understood Spano to be referring to elements of organized crime, including allegedly Spano's father and uncle who allegedly had been mentioned in the newspapers for illegal activities. (*Id.* ¶ 212.) Kane replied that Spano and his "outfit buddies" did not scare him. (*Id.* ¶ 213.)

On August 8, 2003, four days after he terminated Vazquez, Spano terminated Kane from his employment as a CSJB employee. (*Id.* ¶ 214.) As with Vazquez, Plaintiffs allege that Kane's termination was in violation of the CSJB Employment Manual, and done with Ward's assistance. (*Id.* ¶¶ 219-20, 225, 228, 231.) The termination allegedly was in response Kane's open opposition to Spano's scheme and was intended to intimidate the employees and officers of the union. (*Id.* ¶ 216.) Twelve other CSJB business agents with fewer years of service than Kane were not laid off, in violation of longstanding CSJB policy. (*Id.* ¶ 215.) After Spano denied Kane's initial grievance, Kane filed a grievance with the arbitration panel, but Spano refused to convene a panel. (*Id.* ¶¶ 217, 218, 220.) Kane filed a lawsuit in the Illinois Circuit Court, and the court ordered Spano to convene the arbitration panel and hear Kane's grievance. (*Id.* ¶¶ 221-22.) The CSJB allegedly delayed convening the panel until after Kane had been terminated as a CSJB employee, removed as an elected union official, and expelled from union membership. (*Id.* ¶ 223.) Kane was not aware that the arbitration panel was going to hear his lay-off grievance until twelve hours before it was convened. (*Id.* ¶ 224.) He requested a continuance, but Spano denied it. (*Id.* ¶ 225.) On May 25, 2004, the arbitration panel convened to hear Kane's grievance, but Kane did not attend since he did not have enough time to prepare. (*Id.* ¶¶ 226-27.)

13

The arbitration proceeded with Spano allies Torello and Olvera sitting on the panel, which denied Kane's grievance on June 1, 2004. (*Id.* ¶¶ 228-30.) Kane alleges that he did not appeal the arbitration panel's decision because doing so would have been an exercise in futility. (*Id.* ¶ 232.)

V.    The Removal of Ruiz, Keating and Kane From Their Elected and Appointed Positions

Spano then took a series of steps to remove Ruiz, Keating, and Kane from their elected and appointed positions with the unions, Health Fund, and Pension Fund, and to expel them from membership. (*Id.* ¶ 233.) On February 4, 2004, Spano told Ruiz that he had to retire from all union positions because "outside sources" told Spano that Ruiz "had to go." (*Id.* ¶¶ 234-35.) On February 12, 2004, Spano allegedly reiterated to Ruiz that he had been told by "other people" that Ruiz must "get the f*** out!" (*Id.* ¶ 237.) Ruiz understood "outside sources" and "other people" to be elements of organized crime. (*Id.* ¶¶ 236, 238.) Spano allegedly threatened to cut Ruiz's pay, and carried out his threat by reducing Ruiz's pay from $2,230 per week to $500 per week, eliminating his car allowance of $1,200 per month, and disconnecting his cell phone. (*Id.* ¶¶ 239-40.)

On March 1, 2004, Ruiz asked Keating to investigate a merger between Locals 10 and 20 being planned by Spano and the Spano Group. (*Id.* ¶ 241.) Plaintiffs alleged that this merger was illegal because it was not conducted pursuant to the IUC. (*Id.* ¶ 242.) Keating discovered evidence of such a plan and reported his findings to Ruiz on March 1, 2004. (*Id.*) On March 6, 2004, Ruiz and Keating met with several attorneys about implementing a process provided for in the IUC to place the CSJB in a trusteeship to protect the membership of the CSJB's member local unions. (*Id.* ¶ 245.) On March 11, 2004, the Executive Board of the CSJB was notified of

the trusteeship issue, and Spano threatened Keating with physical violence and told him to leave the Union's property because of his involvement in the Trusteeship process. (*Id.* ¶¶ 246-47.) On March 12, 2004, Spano attempted to call a special meeting of the Executive Board, but was unable to obtain the participation of the required five members, so it was rescheduled for March 18th in New York City. (*Id.* ¶¶ 248-49.) That same day, March 12, 2004, Ruiz and Keating went into federal court seeking a temporary restraining order, which was denied. (*Id.* ¶ 250.)

On March 19, 2004, alleged Spano ally Castro filed charges with the International Union seeking to expel Ruiz, Keating, and Kane from membership. (*Id.* ¶ 251.) Plaintiffs allege that the charges were without merit, and that this was another action taken by the Spano Group to remove opposition to the scheme. (*Id.* ¶¶ 251-52.) Plaintiffs allege that the members of the International Union's Executive Board were on notice of alleged corruption within the CSJB and International Union and the alleged influence of organized crime in the affairs of the Unions. (*Id.* ¶ 255.) On April 5, 2004, the Spano allies held a hearing and found Keating, Kane, and Ruiz guilty of the charges filed by Castro. (*Id.* ¶ 259.) On the same day, based on the International Board's decision to expel Ruiz, Keating, and Kane from union membership, Spano and his allies also removed the three from their respective official positions in the Unions. (*Id.* ¶¶ 260-62.) Ruiz was removed as the International Union's President and as elected President of Local 24, terminated as an employee of the CSJB and the International Union, and removed as Trustee for the Funds. (*Id.* ¶ 260.) Keating was removed from his positions as Vice President of the International Union, Secretary-Treasurer of the CSJB, elected President of Local 16, and was terminated as an employee of the International Union and the CSJB; he also was removed from the position of Trustee for the Funds. (*Id.* ¶ 261.) Kane was removed as Secretary-Treasurer of

Local 24 and terminated as an employee of the CSJB. (*Id.* ¶ 262.) Plaintiffs allege that Spano and his allies could not have effectuated these removals without the assistance of attorneys Widmer and Ward. (*Id.* ¶ 263.)

On April 2, 2004, Keating was advised by an internal auditor that there were financial discrepancies with one of the Funds' accounts. (*Id.* ¶ 266.) Keating discovered who was responsible for the discrepancies, and reported this matter to the Funds' attorney, Auteri, and to the U.S. Department of Labor. (*Id.* ¶¶ 267-68.) Keating continued to conduct an investigation into this matter until he was removed as the Funds Manager on April 14, 2004. (*Id.* ¶ 269.) Plaintiffs allege that Spano needed to remove Keating from his positions with the Funds to keep him from opposing Spano's desire to use the Funds for his own benefit. (*Id.* ¶ 270.) To induce the employer-appointed Trustees to remove Keating, Spano contacted them and told them that Keating had stolen money from the International Union and Local 24, was responsible for the theft of Fund monies, and was shredding documents to cover up his involvement in the theft. (*Id.* ¶ 271.) Spano allegedly had Auteri assist him in telling the Trustees that Keating had stolen $106,000 from the International Union and Local 24 and was responsible for the theft of monies from the Health Fund, an allegation Spano and Auteri knew was not true. (*Id.* ¶¶ 274-76.) The union-appointed Trustees present at this meeting were Spano allies Torello, Flynn, Castro, Olvera, and McDonough. (*Id.* ¶ 278.) Even though they knew the allegations were false, these Trustees voted to remove Keating from all elected and appointed positions with the Funds. (*Id.* ¶ 279-80.) On April 14th, the Health Fund and Pension Fund Trustees terminated Keating as Plan Manager for the Funds and removed him as the elected Chairman of the Health Fund. (*Id.* ¶ 282.)

## PROCEDURAL HISTORY

The procedural history of this case can be found in the Court's two previous opinions of

January 25, 2005, (D.E. 32 in Case No. 04 C 861) and March 15, 2006 (D.E. 46.) To summarize,

Vazquez filed two separate actions in the Northern District of Illinois. In his first action,

Vazquez sought an order vacating an arbitration award upholding his termination as a business

agent of the CSJB, and also sought an order vacating an arbitration award upholding Local No.

10's removal of Vazquez as an elected officer. In his second action, Vazquez filed a suit against

the CSJB, International Union, and Local No. 10 alleging the breach of certain union governing

documents and a violation of the LMRDA.

In its January 25, 2005 Memorandum Opinion, the Court denied in part and granted in

part the Defendants' motion to dismiss. (D.E. 32 in Case No. 04 C 861.) The Court held that it

lacked subject matter jurisdiction over some of Vazquez's claims under Section 301 of the Labor

Management Relations Act (LMRA), and that Vazquez had stated a claim under the LMRDA on

various grounds. (*Id.* at 28.)

Vazquez subsequently filed his First Amended Complaint, adding the Plaintiffs and

Defendants involved in this action. (D.E. 46 at 1.) The First Amended Complaint reiterated

some but not all of Vazquez's original allegations, added similar allegations on behalf of Ruiz,

Keating, and Kane, and added new allegations as well. Defendants filed a motion to strike and to

dismiss various aspects of this complaint, which the Court granted in part and denied in part. (*Id.*

at 26.) The Court will refer to the specific holdings of the aforementioned opinions to the extent

they are relevant to the analysis set forth in this opinion. Plaintiffs subsequently filed their

Second Amended Complaint, which is at issue in this opinion. (D.E. 97.) For the reasons stated

below, the motions to dismiss are granted in part and denied in part. To the extent dismissals are without prejudice, Plaintiffs will have one more chance to file an amended pleading if they wish, although the Court already has ruled that Plaintiffs may move forward on claims that afford the chance of substantial and material relief, so it may be prudent simply to proceed. That decision, of course, is up to the Plaintiffs; however, if they wish to replead, given the multiple opportunities they already have been afforded, this will likely be their final chance to do so, barring unforeseen or exceptional developments.

STANDARD OF REVIEW

"A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of a complaint for failure to state a claim upon which relief may be granted." *Johnson v. Rivera*, 272 F.3d 519, 520-21 (7th Cir. 2001). In ruling on a motion to dismiss, the court must assume all facts alleged in the complaint to be true and view the allegations in the light most favorable to plaintiffs. *See, e.g., Singer v. Pierce & Assocs., P.C.*, 383 F.3d 596, 597 (7th Cir. 2004). However, "the complaint must describe the claim in sufficient detail to give the defendant 'fair notice of what the . . . claim is and the grounds upon which it rests.'" *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, ___ U.S. ___, 127 S. Ct. 1955, 1964 (2007)). In addition, the allegations in the complaint must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a "speculative level"; if they do not, the plaintiff pleads himself out of court. *Id.* (citing *Bell Atlantic*, 127 S. Ct. at 1965).

DISCUSSION

I.     The LMRDA Claims Are Dismissed in Part

In a Memorandum Opinion and Order of January 25, 2005, the Court denied the CSJB,

18

International Union, and Local No. 10's motion to dismiss Vazquez's LMRDA claims in his

earlier Complaint. (*See* D.E. 32 in Case No. 04 C 861 at 21-28.) The CSJB, the International

Union (together, the "Union Defendants"), and Torello now move to dismiss certain of Plaintiffs'

LMRDA claims in the operative Complaint. These claims involve Sections 101(a)(1), 101(a)(2),

101(a)(5), 301[3] and 609 of the LMRDA.

Title I of the LMRDA grants union members a "Bill of Rights." *See* 29 U.S.C. § 411; *see

also Local No. 82, Furniture and Piano Moving, Furniture Store Drivers, Helpers,

Warehousemen, and Packers v. Crowley*, 467 U.S. 526, 528 (1984). Sections 101(a)(1) and

(a)(2) of Title I, 29 U.S.C. §§ 411(a)(1) and (a)(2), "guarantee equal voting rights, and rights of

speech and assembly, to every member of a labor organization." *Finnegan v. Leu*, 456 U.S. 431,

436 (1982) (internal quotation marks and emphasis omitted).

Section 101(a)(5) of Title I provides that, "No member of any labor organization may be

fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such

organization . . . unless such member has been (A) served with written specific charges; (B)

given a reasonable time to prepare his defense; (C) afforded a full and fair hearing." 29 U.S.C.

§ 411(a)(5). In this regard, precedent teaches that Section 101(a)(5) "guarantee[s] that [union]

members will not be disciplined by their union without certain procedural protections." *Stevens

v. N.W. Ind. Dist. Council, United Bhd. of Carpenters*, 20 F.3d 720, 727 n.16 (7th Cir. 1994);

---

[3] Section 301 provides the federal courts with jurisdiction over "[s]uits for violation of contracts
between an employer and a labor organization . . . or between any such labor organizations." 29 U.S.C.
§ 185(a). In the January 25, 2005 Memorandum Opinion and Order, this Court ruled that it had
jurisdiction over some of the Section 301 claims in Vazquez's original complaint. (D.E. 32 in Case No.
04 C 861 at 18.) Plaintiffs' Section 301 claims are not challenged by Defendants in this round of
briefing.

*English v. Cowell*, 969 F.2d 465, 469 (7th Cir. 1992). Section 102 of Title I, 29 U.S.C. § 412,

provides "authority for a suit against a union based on an alleged violation of Title I of the

[LMRDA]." *Finnegan*, 456 U.S. at 439. Pursuant to Section 102, a Plaintiff can bring a claim

under Section 101(a)(2) even if no 101(a)(5) violation is shown. *See Maddalone v. Local 17,*

*United Bhd. of Carpenters and Joiners of Am.*, 152 F.3d 178, 183 (2nd Cir. 1998) (citing

*Finnegan*, 456 U.S. at 439; and *Black v. Ryder/P.I.E. Nationwide, Inc.*, 970 F.2d 1461, 1468 (6th

Cir. 1992)).

"[S]ection 609 [of the LMRDA] provides that a union and its officers may not fine,

suspend, expel or otherwise discipline any union members for exercising such rights to free

speech and assembly." *Brunt v. Serv. Employees Int'l Union*, 284 F.3d 715, 719 (7th Cir. 2002)

(citing 29 U.S.C. § 529). The Supreme Court has stated that "a litigant may maintain an action

under § 102 . . . without necessarily stating a violation of § 609." *Finnegan*, 456 U.S. at 439;

*accord Harvey v. Hollenback*, 113 F.3d 639, 643 (6th Cir. 1997) ("Section 102 provides a right

of action to members 'whose rights . . . have been *infringed*,' . . . which the Supreme Court has

acknowledged is a somewhat broader concept than the term 'discipline' in § 609.") (quoting 29

U.S.C. § 412, with emphasis in *Harvey*, and citing *Finnegan*, 456 U.S. at 439).

A.    Plaintiffs Fail to State a Claim Under Section 101(a)(1)

Section 101(a)(1) of the LMRDA provides that "[e]very member of a labor organization

shall have equal rights and privileges . . . to nominate candidates, to vote in elections or

referendums of the labor organization, to attend membership meetings, and to participate in the

deliberations and voting upon the business of such meetings, subject to reasonable rules and

regulations in such organization's constitution and bylaws." 29 U.S.C. § 411(a)(1). In *Calhoon*

*v. Harvey*, 379 U.S. 134 (1964), the Supreme Court held that Section 101(a)(1) of the LMRDA "is no more than a command that members and classes of members shall not be discriminated against in their right to nominate and vote." *Id.* at 139. In this regard, the Seventh Circuit has taught that Section 101(a)(1) "says only that when voting occurs every union member has equal rights to take part." *Serpico v. Laborers' Int'l Union of N. Am.*, 97 F.3d 995, 998 (7th Cir. 1996). Or, as the Seventh Circuit explained, in order to state a claim under Section 101(a)(1), a plaintiff must "allege *discrimination* against some union members." *Fulk v. United Transp. Union*, 81 F.3d 733, 736 (7th Cir. 1996) (collecting cases; emphasis in original); *accord Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 666 (7th Cir. 1992) (collecting cases).

Plaintiffs argue that their Section 101(a)(1) rights were violated when Vazquez appealed his grievance denial. (D.E. 164 at 17.) Specifically, Plaintiffs argue that this occurred when Spano barred Vazquez from sitting on the arbitration panel, but told Vazquez that Spano would not recuse himself.[4] (*Id.*) Plaintiffs cite no authority for the proposition that the selection of panel members hearing grievances constitutes the right to "nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings" embodied in Section 101(a)(1). Plaintiffs, with all respect, do not make any serious argument as to why this right, which on its face is targeted at meetings and elections regarding union-wide issues, should be extended to the context of nominating panel members to hear grievance appeals. *See Gilvin v. Fire*, 259 F.3d 749, 760-61 (D.C. Cir. 2001) (stating that plaintiff's "claim was properly

---

[4] In the end, Spano did not appoint himself to the arbitration panel, but instead appointed Torello and McDonough. (D.E. 97 ¶¶ 184, 188, 191.)

dismissed because . . . [plaintiff] has failed to articulate how he was deprived of any of the specific rights protected by § 101(a)(1)"). As a result, Plaintiff's objection, at least insofar as it is couched as a putative Section 101(a)(1) claim, is misplaced. The claim is dismissed with prejudice.

B.     Plaintiffs Have Stated a Claim Under Section 101(a)(2)

Section 101(a)(2) of the LMRDA "grants union members the rights of freedom of speech and assembly, including the right to 'express any views, arguments or opinions.'" *Brunt*, 284 F.3d at 719 (quoting 29 U.S.C. § 411(a)(2)). Defendants argue that Plaintiffs' claim under Section 101(a)(2) should be dismissed under *Finnegan*, which held that this Section applied to union members, but not union officers or employees. *Id.*, 456 U.S. at 436-38. Plaintiffs, however, cite *Sheet Metal Workers' Int'l Assoc. v. Lynn*, 488 U.S. 347 (1989), in support of their contention that their removal from office violated Section 101(a)(2). This Court's January 25, 2005 opinion discussed these precedents, but the Court will do so once again since additional parties were added since that opinion issued.

In *Lynn*, the Supreme Court addressed the issue of "whether the removal of an elected business agent, in retaliation for statements he made at a union meeting in opposition to a dues increase sought by the union trustee, violated the LMRDA." *Id.* at 349. A trustee removed the plaintiff in *Lynn* from his position as an elected business representative because of his opposition to an increase in union dues. *Id.* at 350. The *Lynn* plaintiff subsequently brought suit in federal district court, alleging that his removal from office violated Section 101(a)(2) of the LMRDA. *Id.* The Supreme Court held that under the circumstances of the case, the plaintiff's "retaliatory removal stated a cause of action under [§ 101(a)(2) and] § 102." *Id.* at 355; *see also id.* at 358.

22

In so holding, the Supreme Court distinguished *Finnegan*, which held "that the discharge of a union's appointed business agents by the union president, following his election over the incumbent for whom the business agents had campaigned, did not violate" Section 101(a)(2) of the LMRDA. *Lynn*, 488 U.S. at 348-349; *see also Brunt*, 284 F.3d at 719. The Supreme Court noted that in *Finnegan*, it did not consider "whether the retaliatory removal of an *elected* official violates the LMRDA," the factual scenario that was before it in *Lynn*. *Lynn*, 488 U.S. at 353 (emphasis added). The defendant in *Lynn* viewed the *Lynn* plaintiff's "status as an elected, rather than an appointed, official . . . immaterial . . . .," *id*. at 354, and argued that the removal of an elected official was permissible under *Finnegan*. The Supreme Court disagreed, distinguishing between the removal of an elected and appointed business agent, and holding that an elected business agent could, under the appropriate circumstances, state a claim under Section 101(a)(2) and Section 102. *See id*. at 355.

In reaching this holding, the Supreme Court recognized that the "discharges [of the appointed business agents in *Finnegan*] had some chilling effect on the free speech rights of the business agents." *Id*. But it found "this concern outweighed by the need to vindicate the democratic choice made by the union electorate." *Id*. With respect to the democratic choices of the union, the Supreme Court reasoned that its holding in *Lynn* was consistent with the basic objective of the LMRDA that it recognized in *Finnegan*: "'ensuring that unions are democratically governed and responsive to the will of their memberships.'" *Id*. at 352 (quoting *Finnegan*, 456 U.S. at 436; internal brackets omitted). This goal, the Supreme Court explained, was generally furthered by the newly-elected union president's "patronage-related discharg[e]" of the appointed business agents of the ousted incumbent in *Finnegan*, in that the business agents

could potentially "thwart the implementation of his [*i.e.*, the newly-elected union president's] programs." *Id.* at 354-355.

This was not the case with respect to the facts presented in *Lynn*, which involved an elected, rather than appointed, individual. The Supreme Court explained that "[t]he consequences of the removal of an elected official are much different" than the consequences of the removal of appointed business agents, and cited two reasons. *Id.* at 355. First, the removal of an elected business agent denies the union membership the representative of their choice, which runs contrary to the objective of the LMRDA. *Id.* Second, "the potential chilling effect on Title I free speech rights is more pronounced when elected officials are discharged," in that "[n]ot only is the fired official likely to be chilled in the exercise of his own free speech rights, but so are the [union] members who voted for him." *Id.* (citation omitted). This chilling effect on the union membership, the Supreme Court explained, "is precisely what Congress sought to prevent when it passed the LMRDA." *Id.* In this regard, the Supreme Court noted that "democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal." *Id.* (internal quotation marks and citation omitted). Thus, a plaintiff who was removed from elected office can properly state a claim under Section 101(a)(2) and Section 102 of the LMRDA. *Id.*

In support of their contention that the *Lynn* exception to *Finnegan* does not apply, Defendants argue that "not all of the Plaintiffs in the instant case were elected by the members [of the union]."[5] (D.E. 188 at 12.) In this regard, Defendants claim that Vazquez was appointed

---

[5] The Court notes that Plaintiffs' LMRDA Counts include claims that Ruiz, Keating, and Kane were also expelled from membership in the union in violation of the LMRDA. (D.E. 97 ¶¶ 295, 297, 301, 303, 308.) As the Court understands it, Defendants do not argue for dismissal of Plaintiffs' LMRDA claims

to the position of President of Local 10 by the Executive Board of the Local, after he had been elected Vice President of the Local by its members. (*Id.* at 12 & n.4.) Defendants attached an evidentiary exhibit to their response brief in support of their contention that Vazquez was appointed to his position as President of the local. In the wake of this filing, the Court granted Plaintiffs' motion to voluntarily dismiss their claim that "Vazquez was unlawfully removed as President of Local 10 in retaliation for his exercise of protected speech." (D.E. 218 ¶ 8.c; D.E. 220.) Therefore, this opinion only addresses the Section 101(a)(2) claims of Ruiz, Keating, and Kane.

The Union Defendants argue that Ruiz and Keating were elected as officers of the International Union and CSJB by delegates, not rank and file members, so the *Lynn* exception to *Finnegan* does not apply to them. (D.E. 188 at 12-13 (citing *Yager v. Carey*, 910 F. Supp. 704, 726 (D.D.C. 1995)); D.E. 143 at 8-9.) The Union Defendants support this argument with more evidence in the form of a proffered affidavit from Torello that they attached to their reply brief. (D.E. 188-8, Ex. E.) Unlike the case with the claim against Plaintiff Vazquez, this filing did not prompt any motion to voluntarily dismiss claims, and the Court cannot credit the evidence in the Rule 12(b)(6) analysis. At the motion to dismiss stage, the Court's inquiry is "limited to the factual allegations contained within the four corners of the complaint."[6] *Sotelo v. DirectRevenue,*

---

based on Plaintiffs' status as union members, so this opinion does not address that topic.

[6] Documents attached to a motion to dismiss may be considered if they are referred to in the complaint and are central to a plaintiff's claim, *McCready v. eBay, Inc.*, 453 F.3d 882, 891 (7th Cir. 2006), but this is a "narrow exception aimed at cases interpreting, for example, a contract." *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998). Torello's affidavit does not fall into this narrow exception—it was not referred to in the Complaint but rather signed by one of the Defendants in this matter on the day before the reply brief was filed. Therefore the Court will not consider Torello's affidavit in addressing this motion. *See Chicago Dist. Council of Carpenters Welfare Fund v. Angulo*, 169 F. Supp. 2d 880, 883 n.1 (N.D. Ill. 2001) (exhibits attached to reply brief are "inappropriate for consideration" in a Fed. R. Civ. P.

*LLC*, 384 F. Supp. 2d 1219, 1236 (N.D. Ill. 2005) (Gettleman, J.) (collecting cases). The allegations in the Complaint once again state the following: Ruiz was a member and elected President of the International Union, the elected First Vice President of the CSJB Executive Board, the elected President of Local 24, the Servicing Director of the CSJB, a union appointed trustee of the Funds, and a union appointed Trustee on the International Union's Pension Fund. (D.E. 97 ¶¶ 14-15.) Keating was a member and the Third Vice President of the International Union, the elected Secretary-Treasurer of the CSJB's Executive Board, the elected President of Local 16, a union appointed Trustee of the benefits funds at issue in the case, the elected Chairman of the CSJB Health and Welfare Fund (the "Health Fund"), the appointed Plan Manager of various funds, and the appointed trustee of the CSJB Staff Pension Plan. (*Id.* ¶¶ 17-19.) Kane was a member of the International Union, the elected Secretary-Treasurer of Local 24, and a CSJB business agent. (*Id.* ¶¶ 21-23.)

For the same reasons that the Court denied the Union Defendant's motion to dismiss Vazquez's LMRDA claims in the Court's January 2005 Memorandum Opinion, *see* D.E. 32 in Case No. 04 C 861 at 24-25, Plaintiffs' LMRDA claims based on their dismissal from elected positions cannot be dismissed at this stage of the proceedings. First, each Plaintiff claims that he was removed from elected office for opposing Spano. Therefore these claims fall under the LMRDA pursuant to *Lynn*. *See Lynn*, 488 U.S. at 355; *Stround v. Senese*, 832 F. Supp. 1206, 1212 (N.D. Ill. 1993) (plaintiff stated claim of unlawful retaliation for exercising LMRDA rights where he alleges removal from elected position).

_____

12(b)(6) motion to dismiss) (*abrogated on other grounds by Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002)).

Second, as noted in the Court's previous opinion, a free speech/termination claim of this type "might arise if a union official were dismissed as part of a purposeful and deliberate attempt . . . to suppress dissent within the union . . . ." *Lynn*, 488 U.S. at 355 n.7 (internal quotation marks and citation omitted); *accord Brunt*, 284 F.3d at 720. A claim can fall under this category if a dismissal is alleged to be "'part of a series of oppressive acts by the union leadership that directly threaten the freedom of members to speak out.'" *Maddalone*, 152 F.3d at 184 (quoting *Cotter v. Owens*, 753 F.3d 223, 229 (2nd Cir. 1985)). The Complaint gives detailed allegations which suggest such an attempt on the part of Spano—at least for present purposes when evaluated under the standards of Fed. R. Civ. P. 12(b)(6).[7] Torello and the Union Defendants argue that the allegations in the Complaint conclusively establish that Plaintiffs' have not satisfied this standard because "their removals were sporadic isolated events." (D.E. 143 at 10.) But "a dissenting faction need not endure years of harassment" before such a claim will lie. *Maddalone*, 152 F.3d at 184. Rather, "[i]n such cases–rare though they may be–the question is whether an action against the official is merely an isolated act of retaliation for political disloyalty or is instead part of a purposeful and deliberate attempt to suppress dissent within the union." *Franza*, 869 F.2d at 45; *accord Messina v. Local 1199 SEIU, Nat'l Health & Human Serv. Employees Union, AFL-CIO*, 205 F. Supp. 2d 111, 122 (S.D.N.Y. 2002). The Complaint

---

[7] It appears that caselaw may reflect that the standard of proof necessary to prevail on such a claim may be "clear and convincing" evidence. *See, e.g., Toner v. United Bhd. of Carpenters*, No. 96 CIV.0023 SHS RLE, 1999 WL 638602, *5 (S.D.N.Y. Mar. 30, 1999) ("To fall within this exception, plaintiffs must present 'clear and convincing' evidence that their discharge was 'part of a series of oppressive acts by union leadership that directly threatens the freedom of members to speak out.'") (quoting *Cotter v. Owens*, 753 F.2d 223, 229 (2d Cir. 1985)); *see also Franza v. Int'l Bhd. of Teamsters, Local 671*, 869 F.2d 41, 45 (2d Cir. 1989) (stating that successful cases of this sort will be "rare," and also reflecting the "clear and convincing evidence" standard of proof is applied). The Court need not resolve this question for the present, but it may be germane at later stages of the proceedings.

alleges that the Spano repeatedly threatened that the Plaintiffs would be subject to termination or even violence if they opposed him (D.E. 97 ¶¶ 95-96, 99-101, 108, 119, 121, 127, 145-46, 163, 211), and when they continued to oppose him he eventually had them terminated. (*See, e.g., id.* ¶¶ 10-11, 13-15, 17-19, 21-23.) Since the Plaintiffs have alleged a lengthy and long-lasting series of behaviors by Defendants designed to suppress dissent, it would appear that, at least under Rule 12(b)(6), they have sufficiently averred a potential claim. *See Johnson v. Kay*, 860 F.2d 529, 537 (2nd Cir. 1988) (finding that the "nature, intensity, and extent of the defendants' scheme, including threats of physical harm," and other acts of intimidation and disruption of Plaintiffs' Title I rights, were sufficient to allege claim); *Nixon v. United Food and Commercial Workers Int'l Union, Local No. 7*, 751 F. Supp. 1491, 1495 (D. Colo. 1995) ("acts and threats of retaliatory discharge, acts and threats of physical force," acts of censorship of opposition along with threats of withholding severance pay unless opponents signed agreements never to become involved in union affairs, were enough to raise issue regarding whether plaintiff's discharge "was part of a larger purposeful and deliberate attempt to suppress dissent within the Union").

The Union Defendants further contend that Plaintiffs "do not allege that they were part of a discernable dissent movement within the union, or that they communicated their alleged concerns about the unions' leadership to the union membership, nor are there any allegations from which to infer that was the case." (D.E. 140 at 19.) The Union Defendants rely on cases decided at the summary judgment stage to support this argument.[8] (*See* D.E. 140 at 18 (citing

---

[8] The Union Defendants also rely on *Brunt v. Serv. Employees Int'l Union*, 284 F.3d 715 (7th Cir. 2002). (D.E. 140 at 18.) That case held it was proper to deny a plaintiff's Rule 15(a) motion to amend his complaint, which proposed additional allegations that the union president "made various ultimatums regarding the [plaintiffs'] refusal to support his re-election." *Brunt*, 284 F.3d at 720. The court held that these allegations "do not amount to a showing of a pattern of stifling dissent within the union" because

*Toner*, 1999 WL 638602, at *6; *Helmer v. Briody*, 759 F. Supp. 170, 175-76 (S.D.N.Y. 1991)).)

However, at this stage of the proceedings plaintiffs are not required to adduce a triable case; that

determination can await the close of discovery if and when summary judgment motions are filed.

Plaintiffs have pleaded enough facts to raise a right to relief above the speculative level. *See*

*Twombly*, 127 S. Ct. at 1965, 1973 n.14.

      C.      Plaintiffs' Section 101(a)(5) and 609 Claims Are Dismissed In Part

      Defendants also move to dismiss certain aspects of Plaintiffs' Sections 101(a)(5) and

Section 609 claims. In *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493

U.S. 67 (1989), the Supreme Court held that the phrase "otherwise discipline" in Sections

101(a)(5) and 609 was not meant to "include all acts that deterred the exercise of rights protected

under the LMRDA, but rather meant instead to denote only punishment authorized by the union

as a collective entity to enforce its rules." *Id.* at 91; *see also id.* at 92 n.15 ("Congress meant

'discipline' to signify penalties applied by the Union in its official capacity rather than ad hoc

retaliation by individual Union officers."). Therefore, for example, precedent teaches that if a

plaintiff is fired (or otherwise disciplined) by his employer rather than his union, that is "not a

disciplinary act by his Union that would involve the LMRDA." *Konen v. Int'l Bhd. of*

*Teamsters*, 255 F.3d 402, 409-10 (7th Cir. 2001) (collecting cases).

---

the allegations "were precisely what the *Finnegan* holding grants [the union president] the right to do, *i.e.*, fire any employees on the basis of their disloyalty to him." *Id.* In contrast, Plaintiffs state that they were threatened with violence and removed from their elected positions in retaliation for exercising their Title I right to oppose Spano and his purported scheme. This type of claim would appear to merit discovery under the *Lynn* analysis discussed above.

i.      Keating Cannot Maintain a Section 101(a)(5) or 609 Claim Based on His Removal From His Position As Trustee of the Funds

The Complaint alleges that Keating was removed from his position as fund manager of the Funds by their Trustees, not the union. (D.E. 97 ¶¶ 271-83.) Since Keating was fired by his employer rather than the union, Torello moves to dismiss any claims based on this termination.[9] (D.E. 143 at 7.) Such a dismissal appears to be consonant with the Supreme Court's decision in *Breininger,* which stated that, "by using the phrase 'otherwise discipline,' Congress did not intend to include all acts that deterred the exercise of rights protected under the LMRDA, but rather meant instead to denote only punishment authorized by the union as a collective entity to enforce its rules." *Id.,* 493 U.S. at 91. Plaintiffs try to distinguish precedent like *Breininger* and *Konen* by pointing out that the Trustees included not only employer appointed trustees, but also union appointed trustees Spano, Torello, Flynn, Castro, Olvera, and McDonough.[10] (*Id.*; D.E. 97

---

[9] Significantly, in his reply brief, Torello concedes that Plaintiffs have sufficiently pled a violation of Section 101(a)(5) based on the allegations that Ruiz, Keating and Kane were removed from union membership in retaliation for exercising their Section 101(a)(2) free speech rights. (D.E. 187 at 3.) Torello only moves to dismiss any LMRDA claims based on Keating's removal as plan manager for the Funds by their trustees. (*Id.*) Plaintiffs argue that *Konen* is distinguishable because in that case the plaintiff was never disciplined by the unions, whereas Keating was disciplined by the union before the trustees of the Funds also voted to terminate him. (D.E. 164 at 16.) But Torello is only moving to dismiss claims based on Keating's removal by the trustees of the Funds as plan manager, so the prior adverse actions taken against Keating by the union (for which he is being allowed to seek relief) do not change the analysis of the limited issue under review here.

[10] Plaintiffs make additional arguments to distinguish *Konen,* such as the fact that Konen admitted to the misconduct used as the grounds for his termination, while Keating did not, and that the allegations against Keating allegedly were false, and were presented to the trustees without allowing Keating an opportunity to defend himself. (D.E. 164 at 16.) Plaintiffs support this argument with an affidavit from Keating attached to Plaintiffs' response. (D.E. 164-2.) First, the Court must analyze the allegations in the Complaint, not resolve evidentiary disputes that are reserved for summary judgment or trial proceedings; as a result, the Court does not consider the affidavit. *See* Fed. R. Civ. P. 12(b); *Bloch v. Frischholtz,* No. 06 C 4472, 2007 WL 1455826, *5 n.2 (N.D. Ill. May 11, 2007). Moreover, although the Court need not definitively resolve the issue, given that the Court does not consider the arguments predicated on the affidavit, it would appear that these points are not relevant to the *Breininger* analysis, which focuses on whether the union was imposing the discipline, not the merits *vel non* of the charges or

¶¶ 278-83.) This type of claim, in which union officials punish an employee through other means, was argued by the dissent in *Breininger—see id.*, 493 U.S. at 99 (Stevens, J., dissenting, discussing, *inter alia*, the union's alleged "abuse of the hiring hall system," as part of "widespread, improper discipline for political opposition" (internal quotation marks omitted))—and implicitly rejected by the majority. Subsequent cases have rejected claims under the LMRDA that "the union conspired with the company [*i.e.*, the plaintiff's employer] to use the disciplinary system to silence him . . . [where] the union itself did not implement the discipline." *Gilmore v. Local 295, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am.*, 798 F. Supp. 1030, 1041 (S.D.N.Y. 1992); *Camporeale v. Airborne Freight Corp.*, 732 F. Supp. 358, 365 (E.D.N.Y. 1990); *see also United Food and Commercial Workers Int'l Union Local v. United Food and Commercial Workers Int'l Union*, 301 F.3d 468, 474 (6th Cir. 2002) (stating that Section 101(a)(5) claim is properly dismissed where "the alleged punishment did not result from an established union disciplinary process"). In *Maddalone*, for instance, the plaintiffs alleged that union leaders engaged in a personal campaign to suppress criticism of their leadership, and the plaintiffs' termination was announced at a union meeting. *Id.*, 152 F.3d at 185. The court held that these allegations did not meaningfully distinguish *Breininger* since the union leader who allegedly ordered the termination was "not alleged to have been acting on behalf of the union as an official entity . . . ." *Id.* Although *Maddalone* is a Second Circuit case, the Seventh Circuit has appeared to endorse this approach, at least generally, in favorably quoting the statement that, "'where the employer and not the Union disciplines a member for exercise of his [§ 101] rights, the member has no cause of action against the Union under the LMRDA.'"

the procedures used.

31

*Konen*, 255 F.3d at 409-10 (quoting *Gilmore*, 798 F. Supp. at 1041). Even if Keating's removal

from fund employment by the Trustees was the result of a conspiracy of union members to oust

him, it, at least as pleaded, does not appear to have come about as the result of a union procedure.

Moreover, it appears, at least as pleaded, to have been an act of all the employer trustees as much

as any trustees even once nominated by the unions. Therefore, Keating's Section 101(a)(5) and

Section 609 claim based on his removal as Trustee of the Funds is dismissed without prejudice.

If he believes there are further facts that support the claim, he is free to reallege the claim, but it

appears, at least as pleaded, to be flawed under the precedent identified above.

      ii.    Plaintiffs Cannot State Section 101(a)(5) or 609 Claims Based on Their
           Expulsion From Elected Office

The Union Defendants further contend (*see* D.E. 140 at 22-23) that Plaintiffs' allegations

of expulsion from *elected* office also do not state a claim under LMRDA Sections 101(a)(5) and

609—even if they may state claims under other sections of the LMRDA, as the Court has

elsewhere found in Plaintiffs' favor. Section 101(a)(5), again, provides that, "[n]o member of

any labor organization may be fined, suspended, expelled, or otherwise disciplined except for

nonpayment of dues by such organization . . . unless" certain due process mechanisms are

afforded, and Section 609 provides that, "it shall be unlawful for any labor organization, or any

officer . . . or any employee thereof to fine, suspend, expel, or otherwise discipline any of its

members for exercising any right to which he is entitled under the provisions of this chapter."

The leading case on this sort of claim appears to be *Messina v. Local 1199 SEIU, Nat'l*

*Health & Human Serv. Employees Union AFL-CIO*, 205 F. Supp. 2d 111 (S.D.N.Y. 2002), where

the Court interpreted *Finnegan* and *Lynn* to indicate that an elected union officer cannot state a

claim under Sections 609 and 101(a)(5) for removal from his or her office (as opposed to his or

her membership in the union, which is subject to the procedural protections) in disregard of proper procedures. *Id.*, 205 F. Supp. 2d at 125-26. The court looked to *Finnegan*, which held the "the term, 'discipline,' as used in § 609, refers only to retaliatory actions that affect a union member's rights or status *as a member* of the union." *Id.*, 456 U.S. at 437 (emphasis in original). The Supreme Court in *Finnegan* also noted that "Congress used essentially the same language . . . [in Section 101(a)(5)] with the specific intent not to protect a member's status as a union employee or officer." *Id.* at 438. *Messina* found that the exception to *Finnegan* created in *Lynn*, which allowed elected officers to bring a claim under the free speech protections of the LMRDA, did not carry over to the procedural protections provided by 101(a)(5) and 609. *See id.*, 205 F. Supp. 2d at 126. Thus, to the extent an improper removal from elected office infringes the free expression of speech, it can be addressed under the LMRDA, but the LMRDA is not understood to regulate what process unions must use when engaging in personnel actions towards their officers. *Id.* This view in *Messina* appears to be consistent with the weight of caselaw to have addressed this issue. *See Messina*, 205 F. Supp. 2d at 125 (collecting cases); *accord Austin v. United Auto Workers Int'l Union*, No. 04-71915, 2004 WL 2112730, at *2 (E.D. Mich. June 3, 2004) (collecting cases); *Argentine v. United Steel Workers Ass'n*, 23 F. Supp. 2d 808, 819 (S.D. Ohio 1998) (applying Supreme Court precedent). The Court therefore finds that Plaintiffs' claims based on their removal from union office (rather than union membership) do not state a claim under Sections 101(a)(5) and 609. This was the understanding of the law in this circuit prior to *Lynn. See Lux v. Blackman*, 546 F.2d 713, 715-16 (7th Cir. 1976) ("The Plaintiffs were not entitled to a full and fair hearing as provided by § 411(a)(5) [LMRDA Section 101(a)(5)]. Union officers may be removed summarily. The procedural protections of § 411(a)(5) do not

33

contemplate the removal of members from union office.") (internal punctuation omitted). The Court agrees with the reasoning in *Messina* that *Lynn* does not dictate a different result. Therefore, the claims of Plaintiffs under Sections 101(a)(5) and 609 based on their expulsion from union membership are actionable; to the extent the claims relate relate to Plaintiffs' termination as officers, such claims are dismissed with prejudice.[11]

II.    Plaintiffs' Allegations Do Not Suffice to Confer RICO Standing

Defendants variously move to dismiss the RICO claims. Defendants make several arguments, but given the persuasiveness of two independent ones, the Court need not address all of Defendants' contentions. These arguments, which the Court credits, are that (1) Plaintiffs have not alleged the loss of an actionable business or property interest within the meaning of applicable RICO jurisprudence; and (2) Plaintiffs have failed to allege that any injury was proximately caused by Defendants' alleged acts of racketeering, even if they had alleged the loss of a cognizable business or property interest for purposes of a private civil RICO action.

A.    Introductory RICO Principles

In interpreting the civil RICO provisions, the Supreme Court has held that a private plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *see also id.* at 496-97 (stating that "[a] defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct, nor is

---

[11] The Court acknowledges that in *Duffy v. Int'l Bhd. of Electrical Workers*, 780 F. Supp. 1185 (N.D. Ill. 1991), Judge Duff reached an opposite conclusion. *Id.* at 1189-90. The Court respectfully finds that the extended analyses provided in the cases that comprise the majority view, as discussed above, are more compelling than the analysis in *Duffy*. Therefore, the Court sides with the majority view.

the defendant liable to those who have not been injured.") (internal quotation marks and citation omitted). The phrase "injured in business or property" has been interpreted as a standing requirement, rather than an element of the cause of action, and it must be satisfied to prevail on a RICO claim. *See Evans v. City of Chicago*, 434 F.3d 916, 924 (7th Cir. 2006) (citing *Gagan v. American Cablevision, Inc.*, 77 F.3d 951, 958-59 (7th Cir. 1996)). Additionally, it is well-settled that the injury to business or property must be proximately caused by the Defendants' alleged racketeering activity to establish RICO standing for private civil litigants like Plaintiffs. *See, e.g., Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992); *Evans*, 434 F.3d at 931-32. The standing requirement applies to all private civil RICO claims, including such RICO conspiracy claims. *See Schiffels v. Kemper Fin. Servs., Inc.*, 978 F.2d 344, 351 (7th Cir. 1992), *abrogated on other grounds by Beck v. Prupis*, 529 U.S. 494 (2000); *Grange Mut. Cas. Co. v. Mack*, No. 6:06-555-DCR, 2007 WL 2344936, at *4 (E.D. Ky. Aug. 14, 2007) (stating that the standing requirement from § 1964(c) "applies to all claims brought pursuant to RICO, including conspiracy claims.") (citing *Beck*, 529 U.S. at 500-01). As explained below, the Court finds that Plaintiffs do not have standing because they have failed to allege injury to "business or property" within the meaning of applicable civil RICO jurisprudence, and also, independently, because Plaintiffs have failed to allege that any such injury (assuming it existed) was proximately caused by Defendants' alleged racketeering activity. Accordingly, the RICO claims in the case are dismissed without prejudice.

B.      Plaintiffs Have Not Alleged A Valid Business or Property Interest

Assessment of the first ground for dismissal is substantially shaped by multiple concessions Plaintiffs have made in their briefs. These concessions, described immediately

below, were the product of various lengthy discussions in the briefs, and the Court will not extend this already lengthy opinion by rehashing those discussions. Instead, the Court will take the legal landscape in this private civil dispute as the parties (who are all represented) have arranged it. In this regard, the Court notes that Plaintiffs concede that their employment termination cannot be considered an injury to business or property under the RICO statute, even if the employment termination was effectuated in furtherance of a conspiracy to violate RICO.[12] (D.E. 159 at 5-6 (citing *Beck*, 529 U.S. at 505)). Plaintiffs also concede that "the loss of union membership or removal from union elected office" will not confer RICO standing on them under the circumstances of this case. (D.E. 159 at 5-6.) Plaintiffs further concede, going so far as to call it a "truism" (D.E. 159 at 6), that a defendant's "embezzlement of union funds . . . is not sufficient to confer standing upon individual union members as plaintiffs." (*Id.*) In this regard, Plaintiffs further concede that: "Indeed, a plaintiff cannot bring an individual RICO action where the injury he alleges is derivative to him [and] no different than that sustained by similarly situated members of the same union." (*Id.* (citing *Mayes v. Local 106, Int'l Union of Operating Engineers*, No. 93 C 716, 1999 WL 60135, at *3 (N.D.N.Y. Feb. 5, 1999), *aff'd*, 201 F.3d 431 (2d Cir. 1999)).

In the wake of these concessions, Plaintiffs respond to the first prong of Defendants' RICO-standing challenge—namely, that Plaintiffs have not alleged the requisite concrete injury to business or property within the meaning of applicable civil RICO jurisprudence—with the assertion that Defendants' numerous cited "cases are distinguishable in that they do not allege the

---

[12] Plaintiffs do not argue that they had property rights deriving from state law. Therefore any argument on this basis is waived. The Court further notes that Plaintiffs have expressly abandoned any reliance on putative bank fraud counts. (D.E. 218 at 2; D.E. 220.)

extortion of LMRDA rights like the Complaint in the case at bar." (D.E. 159 at 6; *see also id.* at 10 (claiming that there are "several cases establishing that LMRDA rights are property that may be extorted in violation of the Hobbs Act").)

In advancing this argument, the Court notes that Plaintiffs fail to cite a single published case involving private litigants like themselves in which this theory has led to a viable RICO suit. The vast majority of the cases that Plaintiffs discuss at any meaningful length in defense of their RICO count are cases from the criminal setting, where the United States is prosecuting a RICO and/or Hobbs Act charge in an indictment. (*See, e.g.,* D.E. 158 at 13-18.) However, as the Supreme Court has counseled, "there are significant differences between civil and criminal RICO actions." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188 (1997) (citing *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 155-56 (1987)); *see also Klehr*, 521 U.S. at 188 ("criminal RICO does not provide an apt analogy" to a private civil RICO action) (citing *Malley-Duff*, 483 U.S. at 155-56). One of the most "significant differences" that prevents using the criminal cases as analogies to the case at hand is the issue of standing—which, of course, is the issue at the heart of Defendants' arguments under review. In the criminal context, the law does not ask whether the prosecuting sovereign (in this instance, the United States) has "standing" to pursue violations of its own criminal laws: that role for the sovereign—*i.e.*, prosecuting violations of its own criminal laws—is a core component of governmental sovereignty, at the epicenter of what a government does to protect and defend its citizens and to maintain order in civilized society. Thus, the State of Illinois (or any other State) obviously can criminally prosecute a sexual offense, or a larceny, or a narcotics possession, or any number of analogous criminal offenses, even though the State, as sovereign, is not "personally" wronged in the way

one might discuss when analyzing civil standing. The rule is the same, of course, when the United States is the prosecuting entity—*see United States v. Merold*, No. 1:99-cr-00015-MP-AK, 2007 WL 1839441, at *14 (N.D. Fla. June 26, 2007) (rejecting as "patently frivolous" a defendant's assertion that the Attorney General of the United States lacked standing to prosecute him for the charged violations of federal criminal law)—and the concept is seemingly so basic and fundamental that criminal defendants' putative "standing" objections are summarily rejected in unpublished orders when they reach the circuit court level. *See, e.g., United States v. Daniels*, 48 Fed. Appx. 409, 418 (3d Cir. 2002) (per curiam; unpublished) (rejecting as "frivolous" the contention that the United States lacked standing to prosecute defendant for, *inter alia*, narcotics, firearms, and racketeering-based violations and stating, "[a]s sovereign, the United States has standing to prosecute violations of valid criminal laws.").

As a result, this Court need not wade into the seeming split in the lower courts in the criminal context—as acknowledged by the Plaintiffs themselves (D.E. 158 at 17-18)—as to whether LMRDA rights can constitute extortable property or interests so as to properly ground a federal Hobbs Act prosecution. Instead, the Court will assume *arguendo* that the more prosecution-friendly cases cited by Plaintiffs are correct without needing to definitively pass on the issue. That assumption, however, does not even begin to address the questions at hand in this private civil RICO suit—namely, whether Plaintiffs have shown the requisite tangible injury to business or property, as proximately caused by alleged RICO predicates, so as to have RICO standing in this suit.

In this vein, the Court notes that to the extent Plaintiffs discuss any authority from the civil context, it consists—with the exception of a single unpublished district court minute order,

in which the issue of RICO standing was not addressed or raised—exclusively of cases in which the United States as law enforcement officer again was advancing the suit. This cited caselaw also does not appear to be germane (Plaintiffs, with all respect, do not explain how it is), given that the same distinction concerning standing exists between the United States as civil RICO law enforcement officer, on the one hand, and ordinary private RICO litigants like the Plaintiffs here, on the other. In this regard, the Court notes that it is well-settled that the United States lacks the ability to seek treble damages in the civil context—*see, e.g., Malley-Duff*, 483 U.S. at 155; *United States v. Bonanno*, 879 F.2d 20, 27 (2d Cir. 1989); *United States v. Cappetto*, 502 F.2d 1351, 1357 (7th Cir. 1974)—which Plaintiffs seek here; instead the United States proceeds under Section 1964(b) of Title 18, which contains no requirement that the United States is injured in its "business or property," as is the case for private litigants like Plaintiffs. *See* 18 U.S.C. 1964(c) (permitting "[a]ny person injured in his business or property" to seek relief); *Sedima*, 473 U.S. at 497 (private plaintiff's alleged injury must "flow from the commission of the [alleged] predicate acts" of racketeering). What this means, at bottom, is that the United States, as the sovereign, can seek to pursue various RICO cases that Plaintiffs cannot because of standing rules applicable to private litigants like Plaintiffs. Thus, for example, in *United States v. Sasso*, 215 F.3d 283 (2d Cir. 2000), a case the Plaintiffs do not even cite, the government civilly sued the local of a labor union and its executive board for injunctive relief; the defense argued that the United States lacked standing because the government failed "to allege that Mr. Sasso's activities were the proximate cause of any injuries to the United States . . . ." *Id.* at 292. The Second Circuit, speaking through Judge Kearse, explained that this argument was "fundamentally flawed," because RICO "contains no requirement that the government show that it was injured." *Id.* The

Seventh Circuit has rendered similar teaching—stating that, "RICO allows suits by the federal government, § 1964(b), but otherwise only by persons injured in their 'business or property.'" *Dillon v. Combs*, 895 F.2d 1175, 1177 (7th Cir. 1990).[13]  As private civil RICO plaintiffs, Plaintiffs must satisfy the "proximate cause" and injury to "business or property" requirements.

In that regard, the Court notes that Plaintiffs, in support of their seminal argument as to how their RICO counts survive, offer only a single decision in which the plaintiffs were private litigants like Plaintiffs.  In that decision, *Shales v. General Chauffeurs, Salesdrivers & Helpers Local Union No. 330*, No. 04 C 8358, D.E. 89 (N.D. Ill. Aug. 17, 2005)—which is really an unpublished district court minute order—the defendants and the Court addressed a different issue (*i.e.*, whether extortion of LMRDA rights could ever be prosecuted or pursued under the Hobbs Act) than the RICO standing issues on which this opinion is predicated.  In the course of the relatively brief analysis presented in the minute order, District Judge Lindberg was not called

---

[13] Relatedly, it is well settled that a civil litigant who had notice of an allegedly otherwise-fraudulent statement cannot recover under federal anti-fraud laws—*see, e.g., United States v. Rosby*, 454 F.3d 670, 674 (7th Cir. 2006) (collecting cases)—but the government need not prove reliance or justifiable reliance by any victims when prosecuting under "federal criminal statutes dealing with fraud" such as the mail fraud and wire fraud statutes. *See, e.g., id.* (collecting cases); *accord Bank of China v. NBM LLC*, 359 F.3d 171, 176-77 (2d Cir. 2004) (collecting cases).  Similarly, it is well settled that a private litigant must suffer some harm to pursue a civil RICO suit, whereas the government can prosecute a "no loss" RICO case, for example, in the setting of bank fraud, mail fraud, or other putative federally proscribed fraud. *See, e.g., Bank of China*, 359 F.3d at 178 ("Unlike a *criminal* bank fraud prosecution, which serves to protect the integrity of federally insured banks, a *civil* [private] RICO action predicated on bank fraud is intended to compensate the plaintiff-victim for its losses.  If the plaintiff-victim cannot establish that the defendants' actions caused the losses, no recovery is appropriate or warranted.  We therefore now hold that in order to prevail in a civil RICO action predicated on any type of fraud, including bank fraud, the plaintiff *must establish*" that the defendants' alleged misrepresentations caused the plaintiff harm) (emphases in original); *accord id.* ("There is a conceptual difference between criminal bank fraud and bank fraud as a predicate for a civil RICO action" brought by a private litigant); *Pelletier v. Zwiefel*, 921 F.2d 1465, 1499 (11th Cir. 1991) ("When a private plaintiff relies on a violation of the mail or wire fraud statutes as a predicate for civil RICO, he faces an additional hurdle before he can obtain recovery: he must show not only that the mail or wire fraud statutes have been violated, but also that he has suffered injury as a result of the violation."); *see also id.* (citing, *inter alia, Sedima, S.P.R.L. v. Imrex Company, Inc.*, 473 U.S. 479, 496-97 (1985)).

upon to address any question of RICO standing or proximate cause, as the defendants in that case did not raise such issues. *See id.* at 5-6. In discussing whether the Hobbs Act ever can address such alleged LMRDA deprivations, the district court noted that "the state of the law currently is unsettled as to whether these types of acts constitute violations of the Hobbs Act" (*id.* at 5), before siding with two cases (both involving criminal prosecutions) which found that such deprivations could be pursued under the Hobbs Act. *See id.* at 6. As previously stated, the Court has assumed *arguendo* that the more expansive view of the scope of the Hobbs Act is correct, but that does not address or affect the central arguments presented by the Defendants—that (1) Plaintiffs have failed to demonstrate the requisite concrete injury to "business or property" established in well-settled RICO jurisprudence concerning private plaintiffs, many of which decisions have dismissed claims analogous to Plaintiffs' claim here, and (2) Plaintiffs have failed to show that any harm suffered was proximately caused by racketeering acts. As to these issues, Plaintiffs fail to adduce a single case involving analogous litigants in support of their RICO claim. It is not this Court's job to create arguments for Plaintiffs (who are represented), and, for the reasons explained below, Defendants arguments on these issues appear well founded on the basis of the tendered authority.

With respect to the issue of the requisite concrete injury to "business or property" within the meaning of RICO jurisprudence, the Seventh Circuit has stated that the terms "business or property" in § 1964(c) are "words of limitation." *Doe v. Roe*, 958 F.2d 763, 767 (7th Cir. 1992) (rejecting the idea that extortion of sexual favors from the plaintiff was injury to "business or property" for purposes of private civil RICO action, even if sexual favors resulted in reduction of debt claimed); *see also id.* at 769 (defendant's alleged breach of fiduciary duty to plaintiff not

injury to business or property for purposes of private civil RICO suit). The Seventh Circuit has also stated that a plaintiff must allege a "concrete financial loss," which does not encompass a "mere injury to a valuable intangible property interest." *Evans*, 434 F.3d at 932 (collecting cases; internal quotation marks and citation omitted). Put another way, "injuries proffered by plaintiffs in order to confer RICO standing must be 'concrete and actual,' as opposed to speculative and amorphous." *Id.* (collecting cases).

Defendants have identified numerous cases which appear to establish that—at least when one excises the supposed harms that Plaintiffs readily concede cannot confer the requisite RICO standing under applicable caselaw, given the alleged facts of this dispute—Plaintiffs have failed to allege the requisite concrete loss of business and property so as to confer RICO standing in this private civil suit. *See Mayes v. Local 106, Int'l Union of Operating Eng'rs*, No. 93 CV 716, 1999 WL 60135, *4 (N.D.N.Y. Feb. 5, 1999) (stating that, "[u]nquantifiable harm to union membership . . . is not actionable under civil RICO"), *aff'd*, 201 F.3d 431 (2d Cir. 1999)); *accord, e.g., Anderson v. Ayling*, 396 F.3d 265, 271 (3rd Cir. 2005) ("Although plaintiffs claim not only that they were injured in losing their jobs, but also that they were injured by the corruption of their local, this corruption is not a cognizable injury that can create RICO standing.") (internal quotation marks and citations omitted).

Thus, to take another example, in *Donohue v. Teamsters Local 282 Welfare, Pension, Annuity, Job Training & Vacation & Sick Leave Trust Funds*, 12 F. Supp. 2d 273 (E.D.N.Y. 1998), the plaintiff was a fired fund manager for the defendant union, who allegedly discovered that union officers were engaging in a scheme to take money from the fund for their own benefit. *Id.* at 276. She alleged that when she tried to reveal the defendants' corruption, "she became a

target of vandalism, abuse, intimidation, and threats," and was eventually fired. *Id.* The plaintiff argued that "her right, as Fund Manager, to inform the fund participants and others of any violations, and her right to sue on behalf of the funds to recover for defendants' fiduciary breaches constitute property under RICO, sufficient to confer standing." *Id.* at 277. *Donahue* rejected such arguments, stating that "[t]his Court agrees with the Fifth and Ninth Circuits, which hold that injury to mere expectancy interest or to an intangible property interest is not sufficient to confer RICO standing." *Id.* at 277-78 (collecting cases; internal quotation marks omitted). The property interest asserted in *Donohue*, although not a union *membership* right, is comparable to the LMRDA rights upon which Plaintiffs base their claim. Plaintiffs right to oppose Spano as union members is comparable to Donohue's right to use her position to oppose union officers.[14]

Plaintiffs may be able to locate supportive caselaw in support of their RICO claim. They certainly have not done so in response to Defendants' citations, and it is not the Court's place to try to make arguments for represented parties.. Defendants have identified several cases that, when taken in connection with Plaintiffs' concessions, appear on the basis of the arguments presented to require dismissal of the extant RICO claims. The claims are dismissed without prejudice, and if Plaintiffs intend to attempt to advance such claims anew, they, with all respect, should be prepared to defend such claims much more thoroughly; otherwise, Plaintiffs are likely well advised to simply move forward on other aspects of their suit.

---

[14] Plaintiffs point out that they lost wages and employee benefits, which left them in financial distress. (D.E. 159 at 14-15.) Although these are concrete financial losses, they are not losses of LMRDA rights, which Plaintiffs argue is the property that was injured. (D.E. 159 at 6-14.) The loss of wages and benefits are the result of their reductions in salary, and eventual employment termination. As noted above, Plaintiffs concede that this is not a cognizable injury for the purposes of RICO (*id.* at 5-6), a concession seemingly in line with substantial caselaw cited by Defendants.

C.    Even if Plaintiffs Had Pleaded an Injury to Business or Property, They Have Not Shown That Such An Injury Was Proximately Caused By Defendants' Alleged Racketeering Activity

Plaintiffs RICO claims are independently barred on the additional ground that they have not alleged that any concrete injuries to their business or property were proximately caused by the Defendants' predicate acts. To have RICO standing under Section 1962(c), Plaintiffs must show that their injury to business or property was proximately caused by the Defendants' alleged racketeering activity. *See, e.g., Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992); *Evans*, 434 F.3d at 931-32. Similarly, for Plaintiffs to have standing to bring a civil RICO conspiracy claim, a plaintiff "must allege that he sustained an injury to his business or property that was proximately caused by some act of the defendants that was an 'act of racketeering or otherwise unlawful under RICO.'" *Katris v. Doherty*, No. 01 C 6885, 2001 WL 1636914, at *9 (N.D. Ill. Dec. 19, 2001) (quoting *Beck*, 529 U.S. at 507) (internal brackets omitted). An allegation that the injury was caused by an overt act in furtherance of the scheme is insufficient. *Beck*, 529 U.S. at 505.

Plaintiffs highlight their allegations that Defendants engaged in extortion under the Hobbs Act, but they have not alleged that such extortion was the proximate cause of their alleged injuries. The Hobbs act defines extortion as "the obtaining of property from another, *with his consent*, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(a) & (b)(2) (emphasis added). Plaintiffs have not alleged that Defendants' alleged extortion was a proximate cause of Plaintiffs' loss of their LMRDA rights—even if those rights constituted concrete losses of business or property under the RICO jurisprudence discussed above. As alleged in the Complaint, Plaintiffs refused to give up their

LMRDA rights by continuing to oppose Spano and the scheme. Plaintiffs did not lose these rights until they were terminated. Although this Circuit has not specifically addressed the issue, numerous courts have held that a plaintiff cannot allege a RICO injury caused by a Hobbs Act violation where the plaintiffs' injury was caused by their *refusal* to consent to defendants' attempts at extortion. *See, e.g., Camelio v. American Federation*, 137 F.3d 666, 671 (1st Cir. 1998) (dismissing RICO claim and stating that plaintiffs never acceded to alleged illicit demands of defendants; "[a]s [plaintiff] concedes that these attempts did not succeed, they could not have caused his [alleged] injuries").[15] In this regard, the Court again notes that Plaintiffs have expressly conceded, seemingly consistent with extensive caselaw cited by Defendants, that "embezzlement of union funds . . . is not sufficient to confer standing upon individual union members as plaintiffs," and that, "a plaintiff cannot bring an individual RICO action where the

---

[15] This lack of RICO standing is confirmed by Plaintiffs' repeated concessions that the allegations they would frame in terms of extortion really are, at most, *attempted* extortions that were not successful. (*See, e.g.*, D.E. 158 at 12 ("[P]laintiffs acknowledge that they mislabeled certain predicate acts as 'extortion' when they should have been 'attempted extortion.'"). While Plaintiffs are correct that the United States may prosecute attempted extortions under federal statutes such as the Hobbs Act, even if the attempts are not successful (sovereigns prosecute criminal attempts all the time, and have done so for centuries), RICO standing principles require that private civil litigants like Plaintiffs must, *inter alia*, suffer an injury to their business or property before the alleged misconduct is actionable. *See, e.g., Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). The same point is true about various alleged misconduct that Plaintiffs seek to characterize as, for example, unfulfilled threats of murder by Defendants. While such threats may be actionable under criminal or other law (for example, as criminal assaults), they are not acts that can confer RICO standing. Finally, in this regard, the Court notes that while Plaintiffs may identify certain alleged acts that might constitute violations of federal labor laws (*see* D.E. 158 at 18 (Plaintiffs' statement that their complaint "makes myriad allegations regarding . . . retaliatory acts taken [by Defendants] for the plaintiffs' use of LMRDA protected rights to free speech and democratic participation in union affairs")), that does not mean that those allegations automatically give Plaintiffs a private civil RICO claim. Jurisprudence in the RICO area consistently notes that while plaintiffs may well have the ability to recover for all sorts of alleged misconduct on other bases, that misconduct often is not actionable under the civil RICO statute. *See Donahue v. Teamsters Local 282 Welfare, Pension, Annuity, Job Training and Vacation and Sick Leave Trust Funds*, 12 F. Supp. 2d 273, 278 (E.D.N.Y. 1998) (collecting cases); *accord, e.g., Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir. 1992) (collecting cases).

injury he alleges is derivative to him [and] no different than that sustained by similarly situated members of the same union." (D.E. 159 at 6; *accord, e.g., Bona v. Barasch*, No. 01 C 2289 (MBM), 2003 WL 1395932, *26 (S.D.N.Y. Mar. 20, 2003) (Mukasey, J.) (collecting cases, and explaining that "two [federal] circuit courts, as well as a district court in this Circuit, have dismissed RICO claims brought by union members based on the direct injury test where damages resulted from injuries to the unions").) Plaintiffs also concede that neither "a plaintiff's job loss," even if "effectuated in furtherance of a conspiracy to violate RICO," nor "the loss of union membership or removal from union office are . . . independently wrongful acts of racketeering under the [RICO] statute," and thus fail to satisfy the proximate injury requirement vis-a-vis alleged acts of racketeering. (D.E. 159 at 5-6 (collecting cases); *accord, e.g., Bona*, 2003 WL 1395932 at *26 (dismissing private civil RICO suit for failure to allege proximate cause where plaintiffs alleged that defendants, who were trustees of various union funds and providers of investment and management services to those funds, allegedly manipulated the funds so as to enrich defendants; any injuries suffered by fund beneficiaries were too remote as to injuries to the funds themselves) (collecting extensive caselaw).) The Court will not revisit these concessions further, but they too define the analytical landscape, and further undermine Plaintiff's attempt to rebut Defendants' argument about lack of RICO standing predicated on lack of proximate cause. *Accord, e.g., Corp. Healthcare Fin., Inc. v. BCI Holdings Co.*, 444 F. Supp. 2d 423, 432 (D. Md. 2006) (discussing "the long line of cases that deny RICO standing to employees claiming they were terminated because they refused to cooperate with their employers' alleged racketeering scheme," and holding that, "even to the extent the employee's refusal to cooperate led to the termination, the proximate cause of the plaintiff's injury would be the termination rather than the

alleged predicate acts themselves") (collecting cases). As such, Plaintiffs' claim, at least as

pleaded, is indistinguishable from cases brought by plaintiffs who were terminated for refusing to

cooperate in a RICO scheme. *See, e.g., id.*, 444 F. Supp. 2d at 432-33 (collecting cases that

rejected plaintiffs' attempts to "disguise" the standard "failure to cooperate" case "though artful

pleading" and instead dismissed the putative RICO suits). In those cases, the courts have broadly

held that such a scenario does not confer standing under civil RICO. *See Cobbs v. Sheahan*, 385

F. Supp. 2d 731, 737 (N.D. Ill. 2005) (collecting cases).[16] Therefore, assuming *arguendo* that

Plaintiffs' had adequately alleged an injury to their business or property, they have nonetheless

failed to allege that this injury was proximately caused by Defendants' acts of racketeering. As a

result, they lack standing under RICO.

Plaintiffs' failure to fulfill RICO standing requirements means that both their substantive

RICO and RICO-conspiracy claims fail. The claims are dismissed without prejudice.[17]

---

[16] In *Cobbs v. Sheahan*, 385 F. Supp. 2d 731 (N.D. Ill. 2005), an employee of the Sheriff's Department alleged that she was demoted as a result of her refusal to support the Sheriff's political campaign committee. *See id.* at 733. The court found that the "alleged demand for a political contribution in exchange for a patronage job constituted extortion." *Id.* at 734 (internal quotation marks omitted). The court held that since the "plaintiff was a target of defendant's illegal racketeering activity, and was allegedly demoted by reason of that activity, not because of any complaints made about that illegal conduct" then her claim did not fall within the line of cases in which "the plaintiff is a witness to the defendant's illegal activity and is then fired for reporting or complaining about the defendant's conduct." *Id.* at 737. Plaintiffs' claim falls in the latter category, since they allege that their terminations resulted from their stated opposition to Spano and his scheme, a scheme that was directed towards asserting autocratic control over the union rather than against Plaintiffs directly. (D.E. 97 ¶¶ 89, 111.)

[17] Defendants—and, in particular, Defendants Widmer, Ward, and Auteri, who are outside professionals who provided legal and accounting services to the unions—advance various other challenges to the RICO counts against them. At least some of these challenges seem quite serious, and even prompted at least one express concession/clarification from Plaintiffs—namely, that Plaintiffs do not intend to pursue any substantive racketeering cause of action against Defendant Auteri under 18 U.S.C. § 1962(c), notwithstanding language in the Complaint that seemed to suggest to the contrary. (*See* D.E. 155 at 4, 5; *see also* D.E. 97 ¶ 333.) To take another example, Defendant Widmer argues that Plaintiffs fail to allege that he engaged in a pattern of racketeering activity, or that Widmer participated in the operation and management of the enterprise, such that the substantive racketeering count advanced against him under

III.    The Union Defendants' Motion to Dismiss Kane's State Law Contract Claim is Granted

The Union Defendants move to dismiss Count X on the grounds that Kane failed to

arbitrate his firing, as was required by his Employment Agreement.[18]  (D.E. 140 at 24.)  Kane

---

18 U.S.C. § 1962(c) is defective.  (D.E. 106 at 4-7.)  Plaintiffs do not even attempt in their response to address these arguments of Widmer.  The Court need not definitively resolve all of these challenges, given the dismissal without prejudice of the RICO counts for the reasons stated at length above.  Nonetheless, while Plaintiffs are free, if they wish, to attempt to readvance RICO claims against Widmer, Ward, and Auteri, Plaintiffs are respectfully advised that they appear to face at least some substantial additional challenges under the precedents discussed in the briefs, over and above whatever other challenges may exist on the RICO claims.

[18]  It is appropriate for the Court to examine the Employment Agreement in ruling on the Union Defendants' motion to dismiss, though it is unclear which Federal Rule of Civil Procedure applies to that motion.  The Union Defendants purportedly bring this motion under Rule 12(b)(6).  (D.E. 140 at 1.)  The Seventh Circuit has declined to decide the procedural vehicle to be used when a party brings a motion to dismiss a claim that is covered by an arbitration agreement.  In *Cont'l Cas. Co. v. Am. Nat'l Ins.*, 417 F.3d 727 (7th Cir. 2005), the court noted that federal courts are in conflict over whether such a motion falls under Rule 12(b)(1) for lack of jurisdiction, Rule 12(b)(6), for failure to state a claim, or whether such dismissal is "entirely separate from the Rule 12(b) rubric."  *Id.* at 732.  In *Continental*, the Seventh Circuit declined to choose between these "competing characterizations" because the arbitration agreement had a forum selection clause that "required arbitration in other districts."  *Id.* at 732-33.  District courts have interpreted the decision to mean that "[w]here parties to a contract have agreed to arbitrate disputes arising from that contract, dismissal pursuant to Rule 12(b)(3) is appropriate."  *Hotel Employees & Restaurant Employees Int'l Union Welfare Fund v. Conn. Gen. Life Ins. Co.*, No. 07 C 712, 2007 WL 1030454, at *1 (N.D. Ill. March 27, 2007) (collecting cases); *Mason v. Bway Corp.*, No. 05 C 516, 2007 WL 329156, at *5 (N.D. Ill. Jan. 25, 2007); *accord Continental*, 417 F.3d at 735 (holding that, "because the Federal Arbitration Act forbids the district court to compel arbitration outside the confines of the district, the court properly dismissed the action").  At least one other district court in this circuit has held that where an arbitration agreement "is intended as the sole means of initiating, presenting, and resolving employment disputes," a motion to dismiss an employment based claim is brought pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.  *Lamb v. Gen. Elec. Consumer & Indus.*, No. 1:06 CV 216, 2006 WL 2228962, at *2 (N.D. Ind. Aug. 3, 2006).  In *Lamb*, the court interpreted *Continental* to state that Rule 12(b)(3) would only apply "if the Arbitration Agreement expressly stated that arbitration was to take place in a district other [than the district where the court was sitting]."  *Id.*, 2006 WL 2228962, at *2 n.3.  Since the agreement at issue states that the arbitration procedures specified are "the exclusive remedy for any . . . employment related dispute," (D.E. 140-15 ¶ 9), the reasoning in *Lamb* potentially would be applicable here.  However, the Court need not choose between these precedents.  If this motion is brought pursuant to Rule 12(b)(1) or 12(b)(3), the Court is allowed to consider matters outside the pleadings.  Fed. R. Civ. P. 12.  If the motion is appropriately brought under Rule 12(b)(6), the Court can consider the employment agreement because it is central to Plaintiffs' claim.  *See Continental*, 417 F.3d at 731 n.3.  Since Kane's employment agreement specifies the arbitration procedure referred to in the Complaint (D.E. 97 ¶¶ 220-232), the agreement is appropriate for consideration on a Rule 12(b)(6) motion.  *See Continental*, 417 F.3d at 733-34 (finding that arbitration agreement was properly considered

does not dispute that he was subject to the arbitration provisions of his Employment Agreement (D.E. 97 ¶¶ 311-12), and the Union Defendants have submitted a copy of the Agreement, which bears Kane's signature. (D.E. 140-15 at 7.) The Employment Agreement between Kane and the CSJB states that "[a]ny dispute arising during the term of this Employment Agreement . . . shall be heard before a three member panel consisting of an Officer of CSJB appointed by CSJB President, the Presidents of Employee's Local Union and another employee or officer of the Central States Joint Board appointed by Employee." (D.E. 140-15 ¶ 9.) The Agreement specifies that the arbitration panel's decision "shall be final and binding upon CSJB and Employee." (*Id.*) Kane was terminated on April 5, 2004, and the term of the Agreement extended three years from his termination, to April 5, 2007. (D.E. 97 ¶ 262; D.E. 140-15 ¶ 8.) The Union Defendants argue that the Complaint does not allege that Kane arbitrated his termination of employment. (D.E. 140 at 24.)

As stated, this dismissal motion refers to Count X, which Kane advances against the CSJB under state contract law regarding his layoff as an employee of the CSJB. (D.E. 97 ¶¶ 311-12.) By way of background, Kane alleges that after he was terminated as an employee of the CSJB, he filed a grievance with the arbitration panel, and when Spano refused to convene a panel, Kane filed a suit with the Illinois Circuit Court to compel Spano to convene a panel. (*Id.* ¶¶ 218, 220, 222.) The panel was later convened, but Kane allegedly was only provided twelve hours' notice and was denied a continuance. (*Id.* ¶¶ 224-25.) Kane did not attend and the panel

in light of its relation to the allegations in the Complaint and its broad language covering "'any dispute arising out of this Agreement.'" For these reasons, and in light of the fact that Plaintiffs have not argued that the employment agreement is improper for consideration, the Court will consider the employment agreement in addressing the motion.

denied his grievance, and Kane did not appeal the arbitration decision. (*Id.* ¶¶ 228-30, 232.)

When a plaintiff's claim is covered by an arbitration agreement, the relevant body of law is the Federal Arbitration Act ("FAA").[19] 9 U.S.C. § 1 *et seq.* The FAA "governs the enforcement, validity, and interpretation of arbitration clauses in commercial contracts in both state and federal courts." *Jain v. de Méré*, 51 F.3d 686, 688 (7th Cir. 1995) (collecting cases). However "[w]hether the parties have agreed to arbitrate is determined under ordinary state law contract principles." *Penn v. Ryan's Family Steak Houses, Inc.*, 269 F.3d 753, 758-59 (7th Cir. 2001); *accord Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir. 1997) (collecting cases).

The Supreme Court has held that the FAA applies to employment contracts that are not exempted by 9 U.S.C. § 1. *See Circuit City Stores v. Adams*, 532 U.S. 105, 122-23 (2001) (holding that the exclusion in 9 U.S.C. § 1, which excludes "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" from the FAA's coverage, only applies to transportation workers); *accord Penn*, 269 F.3d at 758 ("In the wake of *Circuit City*, it is clear that arbitration agreements in the employment context, like arbitration agreements in other contexts, are to be evaluated according to the same standards as any other contract."). Labor management committee decisions, such as the one specified in

---

[19] The employment agreement states that it "shall be interpreted and enforced according to the statutes and case laws of the State of Illinois . . ." (D.E. 140-15 ¶ 12.) The relevant Illinois law on arbitration is the Illinois Uniform Arbitration Act. 710 ILCS 5/1 *et seq.* However, "'a general choice of law provision in a contract will not extend to the arbitration clause, absent specific evidence the parties intended it to do so.'" *BEM I, LLC v. Anthropologie, Inc.*, No. 98 C 358, 2000 WL 1849574, at *6 (N.D. Ill. Dec. 15, 2000) (collecting federal and Illinois cases); *accord Gillispie v. Village of Franklin Park*, 405 F. Supp. 2d 904, 909 (N.D. Ill. 2005). This is immaterial to the outcome, in any event, because "[t]he language of the FAA and the Illinois Uniform Arbitration Act is essentially the same." *Gillispie*, 405 F. Supp. 2d at 909 (collecting cases).

Kane's contract, are considered "final and binding arbitration awards." *Tecam Elec. M.V. Inc. v. Local Union 701 of the Int'l Bhd. of Elec. Workers*, No. 01 C 3333, 2001 WL 1338985, at *3 (N.D. Ill. Oct. 29, 2001) (collecting cases). The issuance of an arbitration award generally bars any subsequent court action on the merits of the original claims, unless the award is challenged in federal court within three months after its issuance. *Id.* at *2 (citing, *inter alia*, 9 U.S.C. § 12).

The briefing as to this claim is, with all respect, not the clearest or most comprehensive of that contained in the many briefs tendered in this case. It appears that Kane offers two arguments as to why the claim should not be dismissed. Kane first argues that the arbitration agreement does not apply, and he was thus not required to follow the arbitration procedures set forth in the agreement, because the Union Defendants breached their duty of good faith and fair dealing, in that provisions of the union constitutions and employee handbooks regarding the arbitrations were allegedly not followed.[20] (D.E. 158 at 26-27.) Kane offers no authority, however, for the proposition that the "duty of good faith and fair dealing," can lead to a result where an agreement to arbitrate can be simply ignored. The Illinois Supreme Court has held that a breach of an implied duty of good faith and fair dealing is not a cause of action that is independent of a contract action. *See, e.g., Voyles v. Sandia Mortg. Corp.*, 751 N.E.2d 1126, 1131 (Ill. 2001); *see also Bass v. SMG, Inc.*, 765 N.E.2d 1079, 1090 (Ill. App. Ct. 2002) (stating that, absent an express disavowal, a covenant of good faith and fair dealing is implied in every contract as a

---

[20] Plaintiffs do not appear to dispute that the employment agreement would otherwise apply to Plaintiffs' breach of contract claim. Illinois courts "have generally construed 'generic' arbitration clauses broadly, concluding that the parties are obligated to arbitrate *any* dispute that arguably arises under an agreement containing a 'generic' provision." *Bass v. SMG, Inc.*, 765 N.E.2d 1079, 1085 (Ill. App. Ct. 2002) (emphasis in original). Since the arbitration agreement covers "[a]ny dispute arising during the term of this Employment Agreement" (D.E. 140-15 ¶ 9), it is sufficiently broad to cover any breach of contract claim. *See, e.g., id.*

matter of law and is subject to arbitration). Arguing that the duty of good faith and fair dealing has been violated is thus itself a breach of contract claim, which is subject to the broad arbitration clause at issue, and does not exempt Kane from the requirements of the FAA or Illinois rules concerning arbitration.

Kane also argues that he was not bound by the arbitration agreement because following the dispute resolution procedures allegedly would have been futile. (D.E. 158 at 27) (citing *Stroud v. Senese*, 832 F. Supp. 1206, 1214 (N.D. Ill. 1993).) The futility discussion in *Stroud* relates to what it termed an issue of subject matter jurisdiction concerning a district court's discretion under LMRDA Section 101(a)(4) to excuse a plaintiff's duty to follow certain types of internal union dispute resolution mechanisms before bringing LMRDA claims. *See Stroud*, 832 F. Supp. at 1214-15. *Stroud* exclusively involved claims advanced under Sections 101 and 102 of the LMRDA—*see id.* at 1211—not under Illinois state contract law, which is the express basis on which Kane's claim is advanced (D.E. 97 at 49). Kane has not cited any cases indicating a futility exception under Illinois state contract law in this area and the Court's own research has not revealed any. If Kane is making an argument that the arbitration panel was biased against Kane, or the award is defective because Kane did not have enough time to prepare, the FAA has procedures for making these arguments and addressing these issues. More specifically, the FAA authorizes a party to seek an order vacating an arbitration award that was the product of "evident partiality or corruption in the arbitrators," 9 U.S.C. § 10(a)(2), or where "the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown." 9 U.S.C. § 10(a)(3). Kane has not moved to vacate the award (D.E. 97 at 50), nor advanced any argument under the FAA in his briefing. Given the paucity of briefing on this claim, the Court will not

dismiss it with prejudice. However, based on the submissions tendered, this state law claim of Kane's is dismissed.

IV.     Torello's Motion to Dismiss Plaintiffs' State Law Claims Is Granted In Part

Before they were dismissed from the case (D.E. 220), Defendants Flynn and Rodriguez moved to dismiss Counts III and X of Plaintiff's Complaint. (D.E. 134 at 6.) Defendant Torello, who has not been dismissed from the case, adopted Flynn and Rodriguez's motion to dismiss Counts III and X. (D.E. 141 at 3; D.E. 187 at 1.) Count III is a Illinois contract law claim based on Vazquez's termination as an employee of the CSJB. (D.E. 97 ¶¶ 290-91.) As stated above, Count X is a Illinois contract law claim which states that Kane's layoff violated the CSJB Employment Manual and the IUC. (*Id.* ¶¶ 311-12.)

It is permissible for a party to adopt the motion of another party when the facts between the parties are essentially the same and the adoption would promote judicial efficiency. *See Paganis v. Blonstein*, No. 91 C 8047, 1992 WL 137008, at *4 (N.D. Ill. May 29, 1992) (Williams, J.); *see also United States v. Colon*, No. 97 CR 659, 1998 WL 214714, at *2 (N.D. Ill. Apr. 21, 1998) (addressing issue in the criminal context). In this regard, the Complaint names Flynn as a member of the International Board, and Rodriguez as a member of the CSJB Executive Board. (D.E. 97 ¶¶ 33, 44.) Torello is named as a member of both boards. (*Id.*) Count III is directed in part at the members of the International Board and CSJB Executive Board. (*Id.* ¶¶ 290-91.) The Complaint does not make any differentiating allegations concerning Flynn, Rodriguez, and Torello that would preclude the Court from considering Torello's adoption of Flynn and Rodriguez's motion with respect to Count III. Count X only specifically names the CSJB and Spano as defendants (*id.* ¶¶ 311-12), but Flynn and Rodriguez argued for its

dismissal against them as well because Count X is "potentially plead against all defendants herein by virtue of Plaintiffs' incorporation of all prior alleged paragraphs into each subsequent count." (D.E. 134 at 7; D.E. 97 ¶ 311.) Torello is in the same position as Rodriguez if Count X is directed at the members of the CSJB Board, so the Court will also address Torello's motion to dismiss Count X. The Court will refer to the briefing on Flynn and Rodriguez's motion as if it were Torello's.

Torello moves to dismiss Count III on the grounds that Vazquez failed to move to vacate the arbitration award within the time period required.[21] The FAA requires that motions to vacate an arbitration award be made within three months. 9 U.S.C. § 12; accord, e.g., Int'l Union of Operating Engineers, Local No. 841 v. Murphy Co., 82 F.3d 185, 188 (7th Cir. 1996) (collecting cases). The arbitration panel upheld Vazquez's discharge on November 4, 2003 (D.E. 97 ¶ 193-94), so Torello argues that Vazquez was required to filed his action to vacate on or before February 2, 2004. (D.E. 134 at 7.) Vazquez filed this current action on March 8, 2004.[22] (D.E. 1.) However, neither Torello nor Flynn and Rodriguez attached Vazquez's employment

---

[21] Torello also argues that the claim was untimely under the Illinois Uniform Arbitration Act (IUAA), which states that an action to vacate an arbitration award must be made "within 90 days after delivery of a copy of the award to the applicant, except that if predicated upon corruption, fraud or other undue means, it shall be made within 90 days after such grounds are known or should have been known." 710 ILCS 5/12(b); accord McKinney Restoration Co. v. Illinois Dist. Council No. 1 of Int'l Union of Bricklayers & Allied Craftworkers, 392 F.3d 867, 869 (7th Cir. 2004) (noting that the limitations period under Illinois law is 90 days) (internal citation omitted). Given that both the FAA and Illinois law provide for the same time period, the timeliness outcome would appear to be the same under either regime.

[22] Vazquez filed his motion vacate the arbitrator's award in his related case on February 3, 2004. (D.E. 1 in Case No. 04 C 861.)

agreement to the motion to dismiss.[23] The Complaint states that the CSJB Employment Manual provided for the ability to arbitrate (D.E. 97 ¶ 88), and that Vazquez's grievance proceeded to arbitration, (*id.* ¶¶ 176-94), but it does not affirmatively state that Vazquez signed a contract agreeing to arbitration. Plaintiffs do not argue that Vazquez did not sign an arbitration agreement, but they do not concede that he did either. The contract claim is based on the CSJB employment manual, which presumably means that Vazquez signed a contract agreeing to its arbitration provisions, but the burden is on Torello to definitively show this is the case. *See Barnes v. Duffy*, No. 02 C 5530, 2004 WL 2931326, at *12 n.15 (N.D. Ill. Dec. 15, 2004) ("The Defendant bears the burden of demonstrating that an agreement requires arbitration.") (collecting cases); *see also Champ v. Siegel Trading Co., Inc.*, No. 89 C 7148, 1990 WL 19984, at *4 (N.D. Ill. Feb. 27, 1990) ("Since defendants are moving to compel arbitration and stay the present litigation, the burden is on defendants to show they are entitled to such relief.") Therefore, Vazquez's Count III state law contract claim based on the CSJB employment manual cannot be dismissed under Rule 12(b)(6) on the basis of the arbitration agreement. While Torello's argument may ultimately prove well-taken, the matter must be raised anew, if appropriate, at a later stage when an appropriate evidentiary foundation is presented.

Count III also asserts a breach of the IUC. (D.E. 97 ¶ 291.) As this Court has previously noted (*see* D.E. 46 at 15), Seventh Circuit precedent teaches that "a union constitution regulates the relation between the union and its members, not the union and its employees." *Korzen v. Local Union 705, Int'l Bhd. of Teamsters*, 75 F.3d 285, 289 (7th Cir. 1996). Count III is not

---

[23] In contrast, the Union Defendants attached to their motion to dismiss an Employment Agreement, which contained an arbitration provision and was signed by Plaintiff Kane. (D.E. 140-15 at 7.)

based on Vazquez's removal from union membership, as it is explicitly entitled, "Vazquez was terminated as an *employee* of the CSJB contrary to contract law as established by the state of Illinois." (D.E. 97 at 40; emphasis added).[24]  Since Plaintiffs cannot assert a breach of the IUC based on Vazquez's employment termination in this suit, that portion of Count III is dismissed.

With respect to Count X, Kane's grievance was denied by the arbitration panel on June 1, 2004.  (D.E. 97 ¶ 230.)  Kane first became a plaintiff in this action on February 17, 2005, well over 90 days later.  (D.E. 30.)  Plaintiffs do not dispute that Kane's claim was not filed within the 90 day period required by the FAA.  Rather, they make the same arguments regarding the implied covenant of good faith and fair dealing and futility discussed in Section IV.  For the same reasons previously given, these arguments do not absolve Plaintiffs from the requirements of the FAA.[25]  Therefore, Count X is dismissed against Torello as well, again without prejudice if Kane believes he can cure the apparent substantial defects with the claim.

---

[24] In its January 2005 Opinion, by contrast, the Court found that it had jurisdiction over Vazquez's Section 301 claim in part because Vazquez "allege[d] that he is a member of the International Union." (D.E. 32 in Case No. 04 C 861 at 19.)

[25] This timeliness problem also would appear to affect Kane's claim in Count X against the Union Defendants.  As explained, Kane does not appear to contend that his claim somehow falls within the 90-day time limit to advance challenges to an arbitration award; instead, he appears to contend that he did not need to arbitrate the claim at all.  For the reasons stated above, this argument appears defective.

CONCLUSION

For the reasons stated above, the motions to dismiss are granted in part and denied in part. Specifically, to the extent and as explained above, Plaintiffs' claims under LMRDA Section 101(a)(1) are dismissed with prejudice, Plaintiffs' claims under LMRDA Section 101(a)(5) are dismissed in part without prejudice, Plaintiffs' civil RICO claims are dismissed without prejudice, Plaintiff Kane's state contract claim is dismissed without prejudice, and the Plaintiffs' various other state law claims are dismissed in part as explained. The motions to dismiss are otherwise denied.

Mark Filip
United States District Judge
Northern District of Illinois

Dated: *February 29, 2008*